Filed 1/8/16  P. v. Morales CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>OMAR MORALES et al.,<br><br>Defendants and Appellants. | F066830<br><br>(Super. Ct. Nos. LF9190A & LF9190C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Michael E. Dellostritto, Judge.

Susan D. Shors; and Jeffrey S. Kross, under appointments by the Court of Appeal, for Defendant and Appellant Omar Morales.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Oscar Ivan Velasquez-Quinonez.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On October 19, 2012, an information was filed in Kern County Superior Court, charging Omar Morales and Oscar Ivan Velasquez-Quinonez (Morales and Velasquez-Quinonez, respectively; collectively defendants) with dissuading a witness for the benefit of or in association with a criminal street gang (Pen. Code,[1] §§ 136.1, subd. (a)(1), 186.22, subd. (b)(1); count 1), making criminal threats for the benefit of or in association with a criminal street gang (§§ 186.22, subd. (b)(1), 422; count 2), possessing methamphetamine for the benefit of or in association with a criminal street gang (Health & Saf. Code, § 11377, subd. (a); § 186.22, subd. (b)(1); count 3), and actively participating in a criminal street gang (§ 186.22, subd. (a); count 4).  In addition, Velasquez-Quinonez was charged with resisting arrest (§ 148, subd. (a)(1); count 5).[2]

Following a jury trial, Morales was convicted of count 1, and the enhancement allegation was found to be true.  The jury was unable to reach a verdict on counts 2 through 4.  Velasquez-Quinonez was convicted of counts 1, 2, and 4, and the enhancement allegations were found to be true.  The jury was unable to reach a verdict on counts 3 and 5.  With respect to both defendants, the court declared a mistrial on, and subsequently dismissed, the counts as to which no verdict could be reached.  Each defendant was sentenced on count 1 to seven years to life in prison (with sentence on the other counts stayed pursuant to § 654 in Velasquez-Quinonez's case), and was ordered to pay various fees, fines, and assessments.

On appeal, we hold:  (1) The evidence was sufficient to support the convictions and enhancements; (2) The admission of defendants' jail booking statements, though error, was harmless; (3) Defendants were not entitled to disclosure based on the in camera proceedings; (4) No unanimity instruction was required; (5) The trial court did

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

[2]     A sixth count, charging Morales with possessing methamphetamine for the benefit of or in association with a criminal street gang, was dismissed on motion of the prosecutor as being a duplicate of count 3.

not abuse its discretion by denying Velasquez-Quinonez's request for new counsel; and (6) Velasquez-Quinonez has failed to establish ineffective assistance of counsel; but (7) Defendants are entitled to a remand for resentencing and recalculation of conduct credits. Accordingly, we affirm the judgments of conviction, but vacate the sentences and remand for resentencing.

## FACTS

### *The Substantive Offenses*

In September 2012, Cristino Berrelleza (Cristino) resided with his brother and brother's wife and children in the 8300 block of Montal Street, Lamont.[3] Cristino was acquainted with defendants, who were friends with his son, Chris.

Early on September 3, Cristino was outside, eating, because he had arrived home late and did not want to wake anyone. While he was outside, defendants arrived. Velasquez-Quinonez told Cristino that Cristino was in the way, and Velasquez-Quinonez had an order to kill him. He said the order was coming from higher up. He called Cristino a rat or a snitch, accused him of working for the sheriff's department, and said people like him were in the way and that Cristino would be removed.[4] Velasquez-Quinonez said it was Cristino's fault Velasquez-Quinonez's "homie" was in jail. Cristino believed Velasquez-Quinonez was talking about a shooting incident involving a person

---

**3** For clarity, we refer to Cristino Berrelleza, his son Chris Berrelleza, and his brother Jose Berrelleza by their first names. No disrespect is intended.

Undesignated dates are from the year 2012.

**4** Cristino previously had received several text and voicemail messages from Velasquez-Quinonez in which Velasquez-Quinonez threatened to kill Cristino, and said the orders came from higher up, rats like Cristino had to disappear, and it was Velasquez-Quinonez's mission to finish people like Cristino. Velasquez-Quinonez had been sending such messages for about three months. Cristino had talked to Morales about four or five times prior to September 3. They never had any problems.

known as "Lazy Bear."[5]  Cristino was not at home when Lazy Bear was shot.  When he arrived, his brother told him about the shooting.  Cristino did not know who was responsible, although he knew Zaragoza, with whom he had seen Velasquez-Quinonez in the past, had been arrested.  When Velasquez-Quinonez threatened Cristino for putting his homie in jail, Cristino believed he was talking about Zaragoza.

Velasquez-Quinonez, who had his hand to the side toward his waist, said he had a gun and was going to kill Cristino, but Cristino did not see a firearm or anything in his hand.  During this time, Velasquez-Quinonez was approximately six to eight feet from Cristino, while Morales was standing by the street, around 30 feet away.  Velasquez-Quinonez told Cristino that he was not going to do it at night, but to go to the park the next day at 12:00, and he would be waiting.  Velasquez-Quinonez asked if Cristino wanted Velasquez-Quinonez to send him to sleep now.  At some point, Cristino told Velasquez-Quinonez to do it, that Cristino did not care.  Cristino thought Velasquez-Quinonez would do it, but also believed that "when dogs bark … they [don't] bite."[6]  It seemed to Cristino that Velasquez-Quinonez was drunk.

Cristino was not afraid for himself, but was scared for his brother and brother's family, particularly the safety of his brother's young children who were home at the time.  He turned around to knock on the door, because he did not want to have problems there in case what Velasquez-Quinonez was saying was true.  Although Cristino had known Velasquez-Quinonez for over 20 years, since Velasquez-Quinonez was little, and had

---

**5**     Sheriff's Sergeant Gomez, who was involved in the investigation of the gang related shooting of Lazy Bear, explained that it occurred on July 31.  Gomez contacted Lazy Bear (whose real name was Jesus Javier Romo) at Jose's residence on Montal, and saw Lazy Bear and Jose talking.  Both could be heard on the recording of the 911 call from the shooting, which was played for the jury.  Javier Lopez and Daniel Zaragoza were arrested as a result of the shooting investigation.  As of the time of trial in this case, they were awaiting trial on attempted murder and gang-related charges.

**6**     Cristino explained that "there's people that talk[,] … but if they are going to do something, they will do it quietly."

never seen him with a gun, he believed Velasquez-Quinonez had one. Cristino had seen Velasquez-Quinonez in the past with Zaragoza, who had offered to sell Cristino a gun about six months before the events of September 3.

During the incident on September 3, Chris was present in the front yard, although Cristino was not sure whether he arrived with defendants. When defendants left, Chris "took them away." Velasquez-Quinonez's wallet was thrown "in the floor in front of the exit" of the house.

While the incident was going on, Jose called 911. He reported, "There are some guys here threatening me that they came to shoot me." Jose explained the guys — two people, both Hispanic — were in front of the house.[7] He said they left in a white Honda, and described the direction they were headed and the clothes one was wearing. He could not describe the clothes of the other one, who was inside the car.

At approximately 12:55 a.m. on September 3, Gomez and his partner, Deputy Bermudez, were in uniform and a marked patrol vehicle near the intersection of Weedpatch Highway (Main Street) and Lamont Avenue, north of Montal Street, when a white Honda Civic passed them going northbound. The car appeared to be occupied by at least three people. Gomez's attention was drawn to the car because of an object in the front seat, and so he and Bermudez followed it.[8] While doing so, Gomez heard other deputies dispatched to the 8300 block of Montal Street in response to a call of a threatened shooting. Although Gomez did not have a description of any vehicle yet, he felt the Honda could be involved since Montal was south of his location and the car was driving northbound. He then was advised by dispatch that the suspects fled in a white

---

[7]    A recording of the 911 call was played for the jury. During the call, Cristino's and Velasquez-Quinonez's voices could be heard in the background. Cristino was telling Velasquez-Quinonez to get inside the car, as he did not want to have any problems there.

[8]    The object turned out to be a vehicle fender.

Honda headed northbound on Weedpatch Highway. As a result, he attempted to make a traffic enforcement stop of the Honda.

When Gomez activated his car's overhead lights, the Honda went from driving northbound on the correct side of the street to crossing to the shoulder on the opposite side and driving along the front property fences. Gomez believed the driver was trying to evade him, but then the car pulled into a driveway and Gomez pulled in behind it. Chris was the driver. Defendants were the other two occupants of the Honda.

Chris was very argumentative, tried to order Gomez and Bermudez off the property (although neither he nor defendants lived there), and threatened to call Internal Affairs on them. When other officers arrived, Chris was taken into custody.[9] Defendants were then ordered out of the car. Both were in the back seat. Velasquez-Quinonez disobeyed orders to keep his right hand on his head, and there was a struggle before he could be handcuffed. Velasquez-Quinonez appeared to be under the influence of alcohol. Several beer bottles were found in the car. One, a Budweiser bottle on the right passenger floorboard where Morales had been sitting, contained a plastic baggie in which was a usable amount of methamphetamine. No gun was found in the car or on any occupant.

Deputy Morrison read Morales his rights and interviewed him while Morales was in a patrol car at the location of the traffic stop. Asked if he was the only one drinking in the vehicle, Morales replied affirmatively. Morales avoided the question whether the beer bottles in the car were his, but said he had consumed seven beers. Asked about the methamphetamine, Morales said he did not know whose it was. Asked where he had come from prior to the traffic stop, Morales said he came from a friend's house in Bakersfield. When Morrison pointed out Morales was coming from the south but Bakersfield was to the north and asked if the friend's house was on Montal Street,

---

[9]     Chris is not a party to this appeal.

6.

Morales said he came from the "ampm" gas station. Morrison responded that he (Morrison) was at the ampm gas station prior to going to the traffic stop. Morales was then unable to say where he came from.

Morrison transported Velasquez-Quinonez and Chris to jail. On the way, Velasquez-Quinonez said to him, "so you're going to believe a crack head?" In a quieter voice, he then said, "[F]uck that. I know where that mother fucker works."

After the traffic stop, Gomez and Bermudez contacted Cristino at the Montal Street residence. Cristino handed Gomez a wallet containing Velasquez-Quinonez's identification and said it was the person involved. Cristino appeared nervous or afraid. He told Gomez he was scared because the perpetrators had a gun.[10] Cristino said Velasquez-Quinonez had told him that he (Velasquez-Quinonez) was going to kill Cristino for "ratting and snitching on the homie." Cristino said Velasquez-Quinonez expressly mentioned Lazy Bear. Gomez asked if by "the homie," Velasquez-Quinonez meant the shooter of Lazy Bear or the one who drove the black Honda that was involved in the shooting. Cristino responded by saying it was the one who drove the black Honda. As Gomez had arrested both Lopez and Zaragoza, he knew that was Zaragoza.

Gomez interviewed Cristino on three occasions, all of which were recorded.[11] The first took place around 1:25 in the morning after the incident at the home on Montal Street. During this interview, Cristino was transported to the scene of the traffic stop, and an in-field showup was conducted.[12] The second interview began around 2:15 that morning, after Cristino was transported back to the Montal Street house. The third and

---

[10] No gun was located at the scene.

[11] Recordings of the interviews were played for the jury.

[12] Cristino was shown defendants and Chris. He initially identified Morales as Chris. According to Cristino, the white Honda belonged to Chris's brother, who was in Mexico at the time. Cristino did not know what arrangements the brothers made with regard to the vehicle.

final interview took place the following day. The second and third interviews were conducted so Gomez could ask follow-up questions and get some clarifications from Cristino. During the third interview, Cristino still seemed nervous, although not to the extent he had the day before.

During the first interview, Cristino said Velasquez-Quinonez, who was his ex-wife's nephew, asked him if he reported that Velasquez-Quinonez's homie shot Lazy Bear. Cristino did not know whether Velasquez-Quinonez was a gang member. Cristino worked fixing cars in the back yard. Lazy Bear would come over a couple times a week to help him with the diagrams and wires, because Cristino could not read English. Cristino saw a black car go by. The person had shot Lazy Bear before. Lazy Bear was shot the next day.

When Velasquez-Quinonez was talking about his homie, Cristino believed he was talking, not about the person who was arrested for shooting Lazy Bear, but rather the person who drove the black car. Cristino related that Velasquez-Quinonez said his homie had nothing to do with the shooting, and that was why he wanted to kill Cristino. Velasquez-Quinonez told Cristino that if Cristino saw him anytime, Velasquez-Quinonez would kill him, and Velasquez-Quinonez had the gun ready for Cristino. Velasquez-Quinonez also told Cristino that he wanted to see him at 12:00 the next day in the park.

Cristino related that there was another person with Velasquez-Quinonez. Cristino had never seen him before and did not know who he was. Cristino did not see a gun during the incident. Cristino had been standing by his truck, eating, when the car stopped in the middle of the road. Velasquez-Quinonez quickly exited, and said he had been looking for Cristino, and that Cristino had gotten Velasquez-Quinonez's homie in jail and Velasquez-Quinonez had the gun ready for him and wanted to kill him right then. Velasquez-Quinonez said he had seen Cristino "'in the book'" and accused Cristino of working for the sheriff.

In the second interview, Cristino said Morales was driving the car when it pulled up. Morales got out of the car and told Cristino to come outside the gate, that he had the guns right there, and that the guns were ready for Cristino and Cristino put the homies in jail. Velasquez-Quinonez was the one saying he was going to kill Cristino. Velasquez-Quinonez actually walked inside the gate and was about two feet from Cristino. He said he would kill Cristino right then. Cristino knocked on his brother's door and told him what was being said. His brother called the sheriff's department. Chris said he wanted to take Velasquez-Quinonez home right then, and that Velasquez-Quinonez was drunk. Cristino did not know if Chris was already there, because Cristino had just returned from his girlfriend's house. Defendants and Chris then left, with Chris driving. As Velasquez-Quinonez left, he told Cristino he would see him the next day in the park.

Gomez asked whether Cristino took the threats seriously. Cristino said yes, and that Velasquez-Quinonez had previously sent him text messages, in one calling Cristino a rat and saying Velasquez-Quinonez wanted to kill him. Cristino no longer had the messages because he no longer had a phone. Cristino believed that had he walked outside the gate, one or both defendants would have "smack[ed him] off." Asked if he knew whether Morales was a gang member, Cristino said no, but Morales's brother was.

In the third interview, Cristino related that Velasquez-Quinonez said the order was coming from the "'up people,'" like Velasquez-Quinonez was a "mafia guy or something." When defendants were talking about Cristino ratting and their homie getting arrested, Cristino knew they were talking about the Lazy Bear shooting, because Jose had told him. Cristino had not been present, but when he returned, Jose told him the fat guy had been shot and had run over, and Jose had gotten the ambulance. Jose also said he had seen the car, which was a dark car. Cristino had seen the black car come by two or three times when Lazy Bear came over to help Cristino. The driver had shaved hair and was "Danny," the brother-in-law of Cristino's stepson.

9.

Cristino related that Velasquez-Quinonez said he was there to finish people like Cristino, and that he came to kill Cristino because his homie was in jail because of Cristino. When Cristino said he (Cristino) did not have anything, Velasquez-Quinonez asked if Cristino wanted him to put him to sleep right then or what. Cristino told him if he was going to do it, go ahead. Velasquez-Quinonez said he would give Cristino "'iron'" right then, meaning he would shoot him. Velasquez-Quinonez subsequently said he would not do it right then because there were a lot of people around, but that he wanted to see Cristino in the park the next day.

Cristino related that Morales told him to come on out, that he had the guns ready for Cristino. Velasquez-Quinonez also said he had a gun, and held his hand as if he was holding one. Cristino did not see guns anywhere.

On September 5, Morales telephoned an unidentified female from jail.[13] Morales (who, along with Velasquez-Quinonez, had been arraigned and informed of the nature of the charges that morning) related that "[t]hey" were trying to get him for threatening someone, but he did not do anything. When asked whom he was supposed to have threatened, he said, "I don't know. Because fucking some shit, I don't know with Ivan and Chris."[14] He also asked the person with whom he was talking to call "Anna," tell her he was "busted," and that he should have "gone with her instead of … going over –." A few days later, Morales telephoned his cousin and expressed regret for not going with her.

On September 7, Velasquez-Quinonez telephoned his mother. They discussed what would happen if Cristino dropped some of the charges. Velasquez-Quinonez said he needed Cristino to say it was not true, and asked his mother to go and talk to Cristino.

---

[13] Recordings of the calls made by each defendant from jail were played for the jury and admitted only against the defendant making the call.

[14] Velasquez-Quinonez was known by his middle name, Ivan, to his family and friends.

Velasquez-Quinonez said she should tell Cristino that Velasquez-Quinonez said he was never going to bother him.

On September 8, Velasquez-Quinonez again telephoned his mother. They discussed someone named Bella going to talk to "this bothersome old man." Velasquez-Quinonez said he hoped Bella returned quickly, because "Bego's" car was "locked up," and "[t]hey" wanted to give Bego a strike and he already had one. Velasquez-Quinonez also suggested recording "the guy," as it would help a lot in case he told Bella and the mother the truth but did not want to say the truth in court. Velasquez-Quinonez said he wanted to "know that a bad man like Tino is going to do this to me."[15] Velasquez-Quinonez said he went to get his tools, and Cristino stole his wallet. Then, when the police had Velasquez-Quinonez in the car, Cristino gave them the wallet so they could see who Velasquez-Quinonez was.[16] Velasquez-Quinonez said he just needed for Cristino to say it was not true, and the two most serious charges would be dropped.

Several days after the incident, Velasquez-Quinonez's mother visited Cristino and asked him to have the charges dismissed. She said Velasquez-Quinonez was no longer going to bother him or take anything from the house. Cristino responded that he had not pressed any charges.

On December 25, Velasquez-Quinonez telephoned his cousin, who passed the phone to Cristino. Velasquez-Quinonez said Cristino had to move somewhere else. Cristino refused to talk to Velasquez-Quinonez anymore and gave the phone back to the cousin. Velasquez-Quinonez and the cousin discussed Chris being the only one who could talk some sense into Cristino. Sometime after the call, Chris told Cristino to say

---

**15** Cristino went by the nickname Tino.

**16** Cristino, who worked as a mechanic, denied that Velasquez-Quinonez ever asked about his tools. According to Cristino, Velasquez-Quinonez never had any tools. Cristino purchased the tools he had himself.

Velasquez-Quinonez was not the one, and not to press charges. Cristino was angry after receiving the call and reported it to the sheriff's department.

### *The Gang Evidence*

Gomez spent two years in the street enforcement unit of the gang suppression section. He had training and experience with respect to various street gangs in Kern County. Even though he was no longer in the gang unit, he continued to investigate gang-related crimes almost every day, including in the Lamont area, where he spent the majority of his time. The Lamont area includes Arvin and Weedpatch. The primary criminal street gangs in the area are Lamont 13, with its subsets Varrio Chiques Lamont (VCL) and Lamont Familial Sureños (LFS); Arvin Poorside; and Varrio Weedpatch.[17] VCL was the primary Lamont 13 subset at the time of trial; Lopez and Zaragoza, who both were documented Lamont criminal street gang members, belonged to that subset. Lazy Bear was also a Lamont gang member. In Gomez's training and experience, if a member of Varrio Weedpatch was asked where he was from, he would say "small town gang," Varrio Weedpatch, or Weedpatch. He would never claim Lamont, because Varrio Weedpatch and Lamont are rival gangs.

Morrison was present when defendants and Chris were booked into jail in connection with this case. When Morales, who had a "C" tattooed on the left side of his neck, was asked if he was with any gang, he said he was a Southerner with the Colonia Chiques. Velasquez-Quinonez, who had three dots tattooed in a triangle on his left wrist, claimed he was a southern gang member, but he did not specify a particular clique.[18] Chris said he was a gang member with Weedpatch.

---

[17] Weedpatch is a small area just south of the township of Lamont. It has a Lamont address, but the gang in that area refers to itself as Varrio Weedpatch. Arvin Poorside is a criminal street gang from the City of Arvin.

[18] By the time of trial, the tattoo on Velasquez-Quinonez's wrist had changed into the shape of a clover. The photograph of the tattoo that was admitted into evidence

12.

Kern County Sheriff's Deputy Velasquez was assigned to jail. His duties included booking arrestees. As part of the booking process, inmates are asked medical questions to see if they have any medical problems. They are also asked questions regarding any gang affiliation, so that they are not housed with rival gang members. This is done for inmate safety. The answers to the questions are entered, via computer, into the Criminal Justice Information System (CJIS).

On October 7, 2011, Velasquez booked Morales into jail. When asked if he associated with any gangs, Morales said he was associated with the south. Velasquez asked what set or clique; Morales said Colonia Chiques from Oxnard. Morales's residence at the time was in Arvin.

Velasquez had some training in north versus south, in terms of Hispanic gangs. Southern Hispanic gangs affiliate with prison gangs that associate themselves with the Mexican Mafia. Northern Hispanic gangs affiliate with prison gangs associated with the Nuestra Familia. The two are rivals.

Arvin Police Officer Calderon was the gang expert for the City of Arvin. He explained that reviewing field interview cards is one means of obtaining intelligence about gangs. A field interview card — also known as a street check — is completed any time an officer contacts someone for any reason and does not make a report. Most are in the context of a traffic stop or other detention, or a consensual encounter.

On October 22, 2011, Calderon was involved in a consensual encounter with five subjects in Arvin. The five were Morales, his brother Juan Morales, Velasquez-Quinonez, Victor Mendoza, and Daniel Zaragoza. Calderon asked Zaragoza if he claimed any gangs. Zaragoza said he claimed Lamont. When Calderon asked him why,

_____

showed redness and irritation around the tattoo. Morrison — who had a tattoo himself — knew redness to show around a tattoo when the tattoo was fresh.

13.

then, he was in Arvin, he said he was there visiting a friend of his, Juan Morales, whom he had met in prison.

Calderon had seen Morales in Arvin prior to that date, as he and Juan Morales lived there. Morales had a star tattoo, which Calderon had seen on different subjects in Arvin. Calderon had also seen subjects in Arvin — including Morales — with a tattoo of the letter C. Velasquez-Quinonez had a tattoo of three dots in a triangle formation on his left wrist.

Kern County Deputy Bravo, who testified as the People's gang expert, had been assigned to the gang suppression section since approximately October 2011. He had testified as an expert about four times in court hearings involving criminal street gangs, including one involving Lamont 13.[19]

Bravo described his training and experience, which included personally speaking to a Mexican Mafia member who was in the process of debriefing in prison. This person spoke to Bravo about the criminal activities of members of Southern Hispanic/Sureño gangs, which show allegiance to the Mexican Mafia.[20] One thing the person told Bravo was that it is common for Southern Hispanic gang members to associate with members of other Hispanic gangs, even though there are rivalries within Southern Hispanic gangs on the street level. The street gang rivalries no longer existed once someone is in a custodial setting; at that point, for those who "claim," it becomes Black, Whites, Northern Hispanic, and Southern Hispanic inmates.

Bravo also gained gang intelligence while working on patrol, which he did from approximately June 2006 to March 2009. During his career, he personally contacted between 200 and 500 gang members from various types of criminal street gangs, the

---

**19**     The proceeding involving Lamont 13 was the preliminary hearing in this case.

**20**     Bravo explained that Norteños are basically the equivalent of Sureños, except they show allegiance to the Nuestra Familia, a rival Hispanic gang to the Mexican Mafia and all Sureño gangs in California.

majority being Southern Hispanic gangs throughout Kern County, including Lamont 13. He made over 100 arrests of gang members or associates, and contacted gang members consensually over 100 times. Often, the gang members talked to him about their membership in a gang, the gang itself, and its activities. Bravo also shared information with other law enforcement officers.

Based on his training and experience, Bravo found several similarities among different Southern Hispanic gangs. All that show allegiance to the Mexican Mafia use common signs and symbols, particularly variations of the number 13, the word Sureño and three dots.[21] In terms of hierarchy between the Mexican Mafia and a Southern Hispanic street gang, members of the Mexican Mafia are at the top. They exercise their power through validated associates, and communications and contacts with people who are passing their orders to the "main line" of prisons and out to the streets. Bravo had spoken to Sureños in Kern County who had received wilas (kites), which were encoded messages that could, for example, order someone to have someone else collect money, or pass an order concerning who controlled a certain neighborhood or a certain area of Bakersfield.

Mexican Mafia members who are incarcerated control the streets by passing messages, and through the fear gang members have. Gang members know they can end up in a custodial setting, and if they are on bad terms with the Mexican Mafia or associates, they will be dealt with. They can also be dealt with on the streets. "[D]ealt with" means the person will be disciplined. There are various forms of discipline.

---

[21]    Bravo explained that 13 represents the 13th letter in the alphabet — M or "eme." "La eMe" is the Mexican Mafia. Norteños associate with the number 14, as N is the 14th letter of the alphabet.

Bravo was familiar with gang tattoos. Some Sureños from the Kern County area will have specific tattoos related to Bakersfield or Kern County. Three dots in a triangle pattern tattooed somewhere visible is common. It stands for "my crazy life," and, in Bravo's experience, is used exclusively by Southern Hispanic gang members.

Among Lamont 13 members who are not in custody, assault (or checking) is a common form, and can be for various reasons such as becoming addicted to methamphetamine, stealing from the wrong person such as another gang member's relative, not attending gang meetings, or starting a clique without proper authorization.

Bravo explained that territory is important to traditional turf gangs. Lamont 13 is a traditional turf gang that was created by members within the township of Lamont in order to protect Lamont from rivals outside the township. The gang claims the township of Lamont as its turf. Similarly, the City of Arvin has its own gang; it is a traditional turf gang because it was created by people who resided in that city. Weedpatch is another traditional turf gang. The gangs commit crimes both within and outside their boundaries.

According to Bravo, Sureño gang members commit crimes with Sureños from different gangs. Based on his training and experience, this can occur when Southern Hispanic gang members move, for whatever reason, from their neighborhood into another city. It can also occur — as is often seen in Kern County — due to gang injunctions. For instance, Colonia Chiques became subject to a gang injunction and had members move to Kern County as a result. In addition, sometimes members of different gangs meet while in custody and continue their relationship upon release.

Bravo had spoken to gang members about ways one can lose respect within a gang. The answer he consistently received was to show signs of weakness. For example, if two gang members are in a car and one confronts a person, the other is required to get out of the car to support the first person, no matter what the type of altercation. Anyone who claims to be or is accepted as a Sureño is required to be at the front line of any type of altercation with rival groups.

According to Bravo, gang members care about the reputation of their gang. They want to project power and have a reputation among other Southern Hispanic gang members as being the "baddest" gang. This is why gang members will promote their gangs by yelling "Lamont" or other gang names while committing crimes. In addition,

16.

someone maintains status within the gang by being respected. If there is any act perceived as disrespect, and the person does not meet it and overcome it with retaliation, he will be considered weak, and his status within the gang will fall. Gang members cannot allow themselves to be disrespected by a nongang member. Disrespect cannot go unchecked. If a nongang member assaults a gang member, the gang member will assault the nongang member or even elevate the level of violence. The same is true of someone who calls the police. If gang members find out someone in the neighborhood is a "police caller" — a person who is a reporting party or an anonymous party, or a patrol car is seen at this person's house — the gang will not let that activity go unchecked. Bravo had been told by Lamont 13 members that after the patrol car leaves, they will confront the person and ask why the patrol car was there. If the person gives a reason the gang members accept, the person will not be threatened. If they believe the person is lying, however, he or she will be threatened about calling or cooperating with law enforcement.

Bravo had spoken with Lamont 13 members who informed him that one of the benefits they receive as gang members is being able to commit criminal acts without having them reported and without having witnesses testify against them. They receive this benefit by instilling fear through intimidating witnesses, graffiti, and assaulting people in the community.

Bravo had been told by gang members that they give more credence to crimes committed when at least two people are present. That way, someone can back up the story told by one of the gang members about what was done. In addition, telling young prospects about crimes committed is like a recruiting tool. Bravo had also heard, however, of situations in which there were conflicts within a gang, or disagreements between certain cliques within the larger gang, over things such as disrespecting a family member, someone taking the gang in a direction the other members did not want to go, not retaliating for an act of disrespect, or falsely accusing or speaking in bad terms of another member within the same gang.

17.

With respect to the present case, Bravo found defendants' use of the Spanish word "[f]ierro" (a slang word for gun among gang members), "rat" and "ratted on," and "homie" as being significant to him in forming his opinion this was a gang-related case. Gang members have told him a homie is someone for whom they are willing to get arrested or even die. Bravo explained that not all gang members in a particular gang are on a friendly basis, but that within gangs, there are certain people who associate closely with each other. "[H]omie" is a very important concept to them, as they do not refer to themselves as friends. Ratting, or snitching, means being labeled as an informant or someone who provides incriminating evidence against another person, especially another gang member. If a gang member is verified as having provided information, it is the end of that person's gang career. If a nongang member is a witness to a crime, he or she will be dissuaded from testifying either by the gang members themselves or their family members. Nongang members may be accused of helping law enforcement because they are perceived as having done so in the past or because they have been seen in the company of or contacted by law enforcement in the past.

Bravo was familiar with the Lamont 13 gang and had known about it since he became a deputy in 2006. He had spoken to its members and investigated crimes associated with it. Those crimes included robberies, vandalisms, narcotics possessions, assaults with firearms, and vehicle thefts. He believed, based on his conversations with Lamont 13 members, the gang had been active since at least as early as the 1970's. Based on the number of contacts he had had with Lamont 13 members, the continuing pattern of criminal activity, and the graffiti in Lamont, it was his opinion the gang was continually taking in members. Bravo's "low estimate" was that during the period of time from the Lazy Bear shooting on July 31 to the current incident on September 3, there were approximately 50 participants in Lamont 13. In Southern Hispanic street gangs, there are certain members who have the most influence. From his discussion with

18.

Lamont 13 members, Bravo learned that two of the more influential and feared members of Lamont 13 were Lopez and Zaragoza.

Bravo explained that a clique or a subset is a group within the larger gang. Some of the larger gangs have several cliques based on the size of the gang's territory. Some have none. Lamont 13 had three cliques known to Bravo: the Georgetown Locos, Varrio Chiques Lamont, and Lamont Familial Sureños. All three claim allegiance to the greater gang of Lamont 13, and all share the same culture and ideology. Lamont 13 members had told Bravo that they referred to themselves as "Lamonsters." Their rivals — Arvina 13 and Weedpatch 13 — call them "Lobsters," "Langostas," "[L]ames," or "Lamesters." Some Lamont 13 members have an "845" tattoo, which is the prefix for the majority of telephone numbers in Lamont. They also have tattoos common to Sureño gangs, such as three dots or some type of numbering for 13. In addition, Southern Hispanic gang members from Lamont often shave their heads, although it is not mandatory.

According to Bravo, Lamont 13 and its rivals sometimes put aside their rivalry to work together. While Weedpatch 13 and Arvina 13 had a loose acceptance of each other, Arvina 13 and Lamont 13 had an active rivalry, and Bravo had never personally contacted members of the two gangs committing a crime together.[22] However, Arvin and Lamont are approximately eight miles apart and share a high school, so members of both gangs may have gone to high school together. Lamont 13 is territorial and based in the township of Lamont, but it is not uncommon for gang members to move for reasons beyond their control and sometimes live outside their territory. The Montal Street address in the present case is within the traditional boundaries of Lamont 13.

[22] Arvina 13 and Lamont 13 were both Sureño gangs, however, and in Bravo's experience, he had known Sureño gangs to work together. For instance, he read an offense report from 2007 in which a documented Arvina 13 member, a member of the Squires criminal street gang, and a third subject committed a robbery and subsequent shooting in Bakersfield.

In Bravo's opinion, members of Lamont 13 engage in a pattern of criminal activity, either individually or collectively. Some of the gang's primary activities are assaults with firearms, witness intimidation, narcotics offenses, robberies, and weapons possession.[23] Bravo had talked to members of the community about Lamont 13; they tended to be aware the gang exists and continues to commit crimes in the township of Lamont. He had also talked to members of Lamont 13 about the criminal activity of their gang; they are aware of the crimes other members of the gang have committed, through knowing why a member was arrested and incarcerated and through conversing with other members of the gang.

Bravo opined that as of the time of trial, Lamont 13 was currently an active criminal street gang, and had been so continuously from July 31 to the time of trial. As part of his investigation in this case, Bravo reviewed several cases involving alleged members or associates of Lamont 13.

The first of the predicate cases occurred on or about January 1, 2009, and involved Lopez. Bravo was familiar with the case from conducting the investigation, speaking to some of the deputies involved, and reviewing reports. A vehicle stopped in front of a residence in Lamont. The vehicle's occupants yelled "Lamont" and fired a shotgun at the victim, who was standing in front of the residence. The victim was injured as a result. Deputies identified Lopez as the shooter. Lopez ultimately pled no contest to assault with a firearm and possession of a firearm by a felon. Based on the investigation and speaking with deputies familiar with the investigation and with Lopez, Bravo opined that Lopez was a member of the Lamont 13 criminal street gang at the time of the offense. He also opined the crime was committed for the benefit of, in furtherance of, and in

---

[23]    Those were some, but not all, of the types of activities Bravo personally had investigated in regard to the gang.

20.

association with that gang, based particularly on the statement of a subject who believed he was an intended victim and who was, at the time, a Varrio Weedpatch gang member.

Bravo was familiar with another case involving Lopez that occurred on or about July 16, 2010. Bravo had spoken with other deputies familiar with the case, and had reviewed the facts reported in the investigation and the judgment. In that case, three victims were at a grocery store in Bakersfield when they were confronted by six subjects. During the confrontation, the victims reported that someone yelled out "Varrio Lamont Chiques." The six suspects attacked the three victims, then fled. They were arrested a short time later. Lopez was one of the six, and he subsequently was convicted of assault with force likely to produce great bodily injury and possession of a controlled substance. Four others, who were caught with him, were also convicted of various offenses. Based on the offense report, the promotion of Varrio Chiques Lamont, and information from deputies familiar with Lopez, Bravo opined Lopez and one of the others convicted were active members of Lamont 13 on the date of the offense. He also opined the offense was committed for the benefit of and in association with the Lamont 13 criminal street gang, based on the fact the gang members involved were associating with each other to commit and promote Lamont 13 and VCL, and the crime was committed for the benefit of instilling fear in the victims and gaining respect by committing a violent attack in a very public place.

Bravo was also familiar, from reviewing the offense report and speaking to deputies involved, with a case involving Samuel Berrelleza that occurred on July 12, 2011. In that case, the victim was confronted by several subjects, including Berrelleza and Johnny Barron. Berrelleza threatened to cause great bodily injury and claimed he was from Lamont. Barron was identified by the victim as having pointed a firearm at the victim's head. Both suspects were arrested and pled no contest to assault with a deadly weapon. Based on information from deputies familiar with him, photographs of tattoos Berrelleza had on the date of the offense, the promotion of Lamont 13 during the offense,

21.

and their association, Bravo opined that Berrelleza and Barron were members of Lamont 13.[24] He also opined the offense was committed for the benefit and furtherance of, and in association with, Lamont 13, as it benefited Berrelleza and Barron to gain respect by committing an act of violence, and furthered the gang by promoting Lamont.

From reviewing the offense report and speaking to the deputies involved, Bravo was familiar with a case involving Zaragoza that occurred on or about September 24, 2009. That day, Zaragoza and Fernando Rojas were contacted by deputies in Bakersfield in a traffic enforcement stop. Zaragoza destroyed a glass smoking pipe and was arrested for possession and transportation of a controlled substance and related offenses. Rojas was arrested for Vehicle Code violations. Rojas was a documented Lamont 13 gang member from VCL, while Zaragoza claimed Lamont 13 at booking. Zaragoza subsequently pled no contest to transportation of methamphetamine. Based on his review of the booking information and speaking with deputies familiar with Zaragoza, Bravo opined Zaragoza was an active member of Lamont 13 at the time of the offense. Bravo further opined the offense was committed in association with the Lamont 13 criminal street gang, in that Zaragoza was contacted and arrested with another documented Lamont 13 gang member.

Bravo was also familiar with a case involving Chris that occurred on or about September 15, 2009. Bravo spoke with the deputies involved in the case and reviewed the incident report. Chris and Alejandro Contreras were identified by the victim as the two suspects who entered the victim's home and robbed him of his property. Both

---

[24]    The report of this incident indicated Barron lived in Shafter, about 20 to 30 minutes' driving time from Lamont. In Bravo's experience, it was not common for people in Shafter to be members of Lamont 13. Barron claimed South when he was booked into the Kern County Jail. This reinforced Bravo's opinion Barron was a participant of Lamont 13 on the day of the offense. The most important aspect of the case was Barron pointing a firearm at the victim's head and Berrelleza yelling "Lamont." This showed the perpetrators were promoting Lamont 13 as a criminal street gang.

subsequently pled no contest to burglary. Based on information from the deputies involved, a review of the facts of the case, and Chris's admission at booking that he was a Lamont 13 member, Bravo opined Chris was a member of Lamont 13 at the time of the offense. Because two active Lamont 13 criminal street gang members were committing the offense in association with each other to benefit the gang by earning respect and instilling fear in the victim, Bravo further opined the offense was for the benefit and furtherance of, and in association with, the Lamont 13 criminal street gang.

Bravo had also reviewed the facts of and spoken with the deputies involved in a case involving Juan Carlos Veliz that occurred on June 11, 2009. In that matter, deputies became involved in a vehicle pursuit. When the vehicle was apprehended, a loaded firearm, methamphetamine, and gang indicia related to Lamont 13's Georgetown Locos clique were found inside. Veliz was convicted of various offenses arising out of the case, including street gang participation. The other subject, Alejandro Contreras, pled no contest to street gang participation. Based on the items found in the vehicle, the type of offenses, what Veliz claimed at booking, and information from deputies familiar with Veliz, Bravo opined Veliz was a member of Lamont 13 at the time of the offense. Based on the same information, plus his association with Veliz during the offense and admission at booking, Bravo further opined Contreras also was a member of Lamont 13 at the time. Based on the same information, including the fact firearm possession was involved, Bravo opined the offense was committed for the benefit and in furtherance of, and in association with, Lamont 13.

From reading the offense report and speaking with deputies involved, Bravo was familiar with another offense involving Chris, this one from May 22, 2006. Deputies contacted Chris and Daniel Pirchardo during a traffic stop. During the investigation, methamphetamine, currency, and drug paraphernalia were located. Chris pled no contest to possession of a controlled substance for sale. Based on his review of the report, Bravo could not give an opinion as to whether Chris was a member of Lamont 13 at the time of

the offense, or whether the offense was committed for the benefit or in furtherance of, or in association with, Lamont 13. However, narcotics sales are a source of income for gang members and a primary criminal activity of Lamont 13. Based on Bravo's review of Chris's latest housing, in his opinion Chris was a current member of Lamont 13 at the time of trial. Bravo also opined Chris was a member of Lamont 13 on September 3, based on his housing in jail and his continuing admissions of claiming South at booking prior to and after September 3.

From reviewing the incident report and speaking with deputies involved, Bravo was also familiar with a case involving Morales that occurred on or about November 14, 2006. In that case, the victim identified Morales, Sergio Morales, and Julio Morales as the three subjects who carjacked and robbed him. Morales and Julio Morales were identified during the investigation as members of the Oxnard criminal street gang known as Colonia Chiques. Julio Morales was convicted of carjacking, robbery, and other offenses that were found to have been committed on behalf of a criminal street gang. The significance of the case was that robbery and carjacking are primary activities of Southern Hispanic criminal street gangs, of which Oxnard Colonia Chiques is one. In light of the indicia Morales and Julio Morales were found to possess, and Morales's tattoos, Bravo opined Morales was an active Sureño gang member, specifically Colonia Chiques.[25]

---

[25] During a 2006 investigation led by the Kern County Sheriff's Office in which Morales was involved, deputies located gang paraphernalia indicating Morales was a member of Colonia Chiques at the time. In addition, deputies found a compact disk (CD) in which the "L" was crossed out. In the deputy's opinion, this showed disrespect to Lamont 13. Bravo had no way of knowing Morales was the person who crossed out the L, however. He acknowledged that "hood hopping" — where a member of one gang starts claiming membership in another gang and denying the first gang — can get one killed or at least checked, but that did not mean a gang member had to live in the "hood" that he claimed, so far as Lamont 13 was concerned. Several Lamont 13 gang members told Bravo that. Bravo also explained that hood hopping was not the same as a member of, for example, an Oxnard gang associating with a Lamont 13 member.

24.

With respect to Morales, Bravo also reviewed field identification cards, photographs of his tattoos, and various records, including his bookings, incident reports, and the report for the current offenses. Morales had a star tattoo below his right ear. Bravo had seen that tattoo on another Colonia Chiques gang member he contacted in 2009, and had been told by a deputy at a jail facility in Ventura County that he had been in contact with several members of Colonia Chiques, and it is one of their common signs or symbols. Morales also had a tattoo of lips along his cheekbone. This is a common tattoo among Sureños, as it forms a one and a three, or 13. Morales also had a "C" tattooed behind his left ear; from speaking with deputies familiar with Colonia Chiques, Bravo learned that this is a common sign or symbol for members of that criminal street gang. Morales also had "OX" tattooed on his leg, which stands for Oxnard and is a common symbol of Colonia Chiques. Morales also had "Chiques" tattooed on his wrist. In addition, he had "805," which was related to Ventura County (in which Oxnard is located), in two places.

Morales was booked into the Kern County Jail on November 16, 2006. The booking sheet indicated that when asked if he belonged to or associated with any gang in or out of jail, Morales answered "south." "South" was also indicated as the answer to the question which clique or set. Morales was also booked into the Kern County Jail on October 7, 2011. "South" again was indicated as the answer to whether he belonged to or associated with any gang in or out of jail; Colonia Chiques was given as the clique or set. Morales was booked into jail for the present offenses on September 3. The booking sheet again stated "South" for gang.[26]

---

[26] We are unable to discern whether "South" was also given for the clique. According to the reporter's transcript, Bravo testified the booking sheet showed: "Which clique or set? And, for the record, its spelled, C-l-i-q-u-e. [¶] And the answer was indicated as when, S for that answer or for that question." (*Sic.*) There are a number of instances in which the reporter's transcript appears to contain errors.

Based on the evidence Bravo heard in court in the present trial, together with his review of the incident report, Bravo formed the opinion Morales was an associate of Lamont 13 on September 3. With respect to the field contact in Arvin, Bravo found it significant Morales was associating with other Lamont 13 members, including Zaragoza.[27] In addition, Bravo considered Zaragoza's explanation of why he was in Arvin; it reinforced Bravo's opinion to have two members of different Sureño gangs associating not just while in prison, but after their release, and meeting on a friendly basis.

Bravo also reviewed information pertaining to Velasquez-Quinonez, including incident reports, booking information, a field contact, and information about tattoos. Velasquez-Quinonez was in court on December 17 when the People presented a written motion for tattoos to be disclosed and photographed. The motion was granted on December 21, and Bravo photographed Velasquez-Quinonez's tattoos on December 26. On Velasquez-Quinonez's left wrist was a shamrock or a club on playing cards. Within that pattern, Bravo could see portions that were darkened in the three-dot triangle pattern. The tattoo was inconsistent with the one Morrison saw when Velasquez-Quinonez was booked into jail on September 3. Based on his conversations with gang members, Bravo knew they sometimes covered up wounds with tattoos to avoid being incriminated in a crime, and covered the names of gang members who had fallen out of favor. He personally had never heard of gang members covering gang tattoos to avoid detection from law enforcement. It was possible to obtain tattoos in jail, however, using the ink from writing pens. In Bravo's opinion, gang members go to great lengths to circumvent being prosecuted, in this case covering up the tattoo.

---

[27]  According to Bravo, Victor Mendoza was a member of the VCL clique of Lamont 13 at the time of Calderon's field contact with him, Morales, and the others. Mendoza was also the boyfriend of Morales's sister.

Bravo considered the facts of the current case in forming his opinion whether Velasquez-Quinonez was a member of Lamont 13 on September 3. He found Velasquez-Quinonez's use of the word "homie" significant, as that word is significant to Southern Hispanic gang members. Bravo also found it significant that Velasquez-Quinonez claimed Cristino was a rat. In Bravo's training and experience, people who cooperate with law enforcement and who are labeled rats or snitches have been assaulted and intimidated to prevent them from reporting crimes or testifying. In addition, Bravo found it significant that Velasquez-Quinonez went with another Southern Hispanic gang member — Morales — to threaten to cause great bodily injury or death to Cristino. Gang members often do such things to show strength in numbers. It is a tactic they use to instill fear.

Bravo also considered the facts of the Lazy Bear shooting. In that incident, Jesus Romo, a self-admitted Lamont 13 member also known as Lazy Bear, was shot by a subject later identified as Lopez. Zaragoza was identified as the driver of the getaway vehicle. After the shooting, Zaragoza drove by Romo's residence, simulated a firearm with his hand, and pointed it at Romo, threatening him. Bravo learned from deputies investigating the case that they believed the motive was Romo telling other members of VCL not to listen to Lopez and Zaragoza and not to follow their orders. Lopez took that as a sign of disrespect.

Bravo reviewed an investigation conducted by the Kern County Sheriff's Office on July 1. Velasquez-Quinonez was interviewed by deputies and asked to identify individuals who possibly were present or involved in the matter under investigation. Velasquez-Quinonez said something to the effect that he would not be labeled a rat, and he did not identify anyone.

Bravo reviewed the contact between Calderon and Velasquez-Quinonez. He found it significant that Velasquez-Quinonez was contacted with members of Lamont 13 and also members of other Southern Hispanic gangs, as Morales was a member of

27.

Colonia Chiques and Juan Morales was a member of the Squires.[28] Bravo also found significant the three-dot tattoo Calderon noted.

With respect to bookings, the booking sheet from November 5, 2009, represented that Velasquez-Quinonez responded "South" when asked if he belonged to or associated with a gang, and which clique, and that he should be kept away from "North." The booking sheet from November 13, 2011, showed the same answers, as did the booking sheet from September 3, the date Velasquez-Quinonez was booked in the present case.

Based on the various items he reviewed, Bravo opined that on September 3, Velasquez-Quinonez was a member of the Lamont 13 criminal street gang.

Asked a hypothetical question based on the prosecution's evidence in the present case, Bravo further opined the current offenses were committed for the benefit of Lamont 13. He explained that a Lamont 13 member was working together with an associate of Lamont 13 for the benefit of Lamont 13, to prevent witnesses from testifying against the homie or homies who were in jail for shooting someone. By the Lamont 13 member and associate threatening to cause great bodily harm or death to a witness, the homies in jail would benefit from the victim/witness being dissuaded from cooperating in a criminal matter, which would allow other Lamont 13 gang members to continue their pattern of criminal activity, gain respect among themselves and other gangs, and instill fear in the community with respect to cooperating with law enforcement. The offenses were also committed in association with the Lamont 13 criminal street gang, because a Lamont 13 member who was threatening the victim was associating with a known associate of Lamont 13.

---

[28] Squires was an Oxnard gang. Bravo had spoken to a former Ventura County sheriff's officer, who related that Colonia Chiques and Squires were rivals. Bravo was aware of a Bakersfield Police Department contact with Morales and his brother, Juan Morales. The field contact indicated both were members of the Squires criminal street gang. Bravo had reviewed Juan Morales's bookings; Juan Morales claimed Colonia Chiques in them.

Bravo conceded that when booked in the present case, Chris said he was a member of Weedpatch. He also claimed Weedpatch in a booking from July 2. Varrio Weedpatch and Lamont 13 are rivals. Bravo was aware Morales had been arrested a number of times. It was his belief that in some of those bookings, he claimed Arvina 13.[29] Bravo testified it was inaccurate to say the present case involved three members of rival gangs in a car threatening a witness. Bravo used numerous factors to determine if someone was a gang member. He did not have to know someone's clique or subset before he could form an opinion that someone was a member of Lamont 13. Knowing that someone claimed a subset at booking simply assisted the documentation process.

## DISCUSSION[30]

## I

### SUFFICIENCY OF THE EVIDENCE

Defendants raise claims of insufficiency of the evidence to support convictions and true findings on gang enhancement allegations. The applicable legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10

---

[29]    Certified booking sheets produced by the prosecutor showed that in some, Morales claimed Colonia Chiques or South with no clique indicated.

[30]    For organizational purposes, we have reordered the issues from how they were presented in the multiple briefs and supplemental briefs.

Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and applies equally to convictions and enhancement allegations (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1197; *People v. Garcia* (2014) 224 Cal.App.4th 519, 522-523).

## A. Dissuading a Witness

Defendants were convicted, in count 1, of dissuading a witness in violation of section 136.1, subdivision (a)(1). Section 136.1, subdivision (a)(1) prescribes the punishment for anyone who "[k]nowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." Subdivision (a)(2) of the statute prescribes the same punishment for anyone who "[k]nowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony" at such a proceeding.[31]

As defined for defendants' jury, "[a] witness [for purposes of section 136.1] means someone or a person that the defendant reasonably believed to be someone who knows about the existence or nonexistence of facts relating to a crime or who has reported a crime to a peace officer." (See CALCRIM No. 2622; § 136, subd. (2).) "The crime of

---

[31] Since there was no evidence Cristino was actually prevented or dissuaded from attending or giving testimony at any legal proceeding, it appears subdivision (a)(2) of section 136.1, not subdivision (a)(1), was the applicable provision. Jurors were instructed in the language of CALCRIM No. 2622, which covered both, however. Since the sentence under either subdivision is the same, it does not appear defendants were prejudiced by the discrepancy, and they do not contend otherwise.

intimidating a witness requires proof that the defendant specifically intended to dissuade a witness from testifying. [Citations.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1210.) "'Unless the defendant's acts or statements are intended to affect or influence a potential witness's or victim's testimony or acts, no crime has been committed under [section 136.1].' [Citation.]" (*People v. Wahidi* (2013) 222 Cal.App.4th 802, 806.) Because intent "is inherently difficult to prove by direct evidence" (*People v. Proctor* (1959) 169 Cal.App.2d 269, 279), "[t]he circumstances in which the defendant's statement is made, not just the statement itself, must be considered to determine whether the statement constitutes an attempt to dissuade a witness from testifying. [Citation.] If the defendant's actions or statements are ambiguous, but reasonably may be interpreted as intending to achieve the future consequence of dissuading the witness from testifying, the offense has been committed. [Citation.]" (*People v. Wahidi*, *supra*, at p. 806.)

Morales concedes that if Velasquez-Quinonez's actions constituted a violation of section 136.1, then the evidence was sufficient to establish Morales aided and abetted those actions. He contends (with Velasquez-Quinonez joining), however, that the prosecution failed to present sufficient evidence to prove the elements of the offense, specifically that (1) one or both defendants tried to prevent or discourage Cristino from attending or giving testimony at trial; (2) Cristino knew the existence or nonexistence of facts relating to the Lazy Bear shooting or reported the crime to a peace officer; and (3) either defendant reasonably could have believed (1) or (2).

If an utterance is "a simple angry statement of impending revenge" or retaliation, section 136.1 has not been violated. (*People v. Ford* (1983) 145 Cal.App.3d 985, 989-990.) Defendants contend such was the situation here. It is true the statements shown by the evidence could be interpreted in that manner. As the evidence also showed and the prosecutor pointed out, however, Zaragoza and Lopez — the "homies" to which the statements referred — were scheduled to have their preliminary hearing three days after the events of September 3. Given the proximity of the court proceedings and the fact

31.

Velasquez-Quinonez threatened to kill Cristino but made no move to carry out the threats at that time, jurors reasonably could have interpreted the statements as knowing and intentional warnings or threats not to testify in the future. (See *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1343-1345; *People v. Ford*, *supra*, at p. 989.) "There is … no talismanic requirement that a defendant must say 'Don't testify' or words tantamount thereto, in order to commit the charged offense[]." (*People v. Thomas* (1978) 83 Cal.App.3d 511, 514.)**32**

Defendants complain that Cristino had no first-hand knowledge of the Lazy Bear shooting and was not the person who reported it to law enforcement. There was evidence, however, that Lazy Bear and Cristino often worked together, and that Cristino had seen Zaragoza's black car drive by them a number of times. Lazy Bear was shot near, and the 911 call made from, the residence at which defendants found Cristino eating. Jurors rationally could have found defendants believed Cristino was a witness in the Lazy Bear case and likely to testify at the preliminary hearing three days hence, and that such beliefs — although wrong — were reasonable under the circumstances.

"'A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.' [Citation.]" (*Coleman v. Johnson* (2012) 566 U.S. ___, ___ [132 S.Ct. 2060, 2062]; accord, *People v.*

---

**32** The unmodified version of CALCRIM No. 2622 permits a trial court to choose the type of judicial proceeding or inquiry authorized by law with respect to which the defendant tried to prevent the witness from attending or giving testimony. (See, e.g., CALCRIM No. 2622 (2013 ed.), vol. 2, p. 490.) Jurors in the present case were instructed the People had to prove, inter alia, defendants tried to prevent or discourage Cristino from "attending or giving testimony *at trial*." (Italics added.) Defendants implicitly concede that for purposes of a substantial evidence analysis, attempting to dissuade Cristino from attending or testifying at a preliminary hearing is sufficient.

*Letner and Tobin* (2010) 50 Cal.4th 99, 165-166; see *People v. Bolin* (1998) 18 Cal.4th 297, 331.)  Defendants' convictions on count 1 are supported by substantial evidence.[33]

B.      **Criminal Threats**

Velasquez-Quinonez was convicted, in count 2, of making criminal threats in violation of section 422.  Subdivision (a) of that statute provides in pertinent part:  "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment .…"

"The statutory language can be divided into five elements the prosecution must prove:  '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement … is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat — which may be "made verbally, in writing, or by means of an electronic communication device" — was "on its face and under the circumstances in which it [was] made, … so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and

---

[33]     In his review of witness intimidation cases, Morales includes "[t]his court['s]" case of *People v. Lopez* (2013) 216 Cal.App.4th 411.  That opinion, which was from the Second District Court of Appeal and not this court, may not properly be cited, as rehearing was granted June 11, 2013, and the subsequent opinion was not certified for publication.  (Cal. Rules of Court, rules 8.1105(b) & (e)(1), 8.1115.)

an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.  [Citation.]'  [Citation.]"  (*People v. Lipsett* (2014) 223 Cal.App.4th 1060, 1064, quoting *People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

"A threat is sufficiently specific where it threatens death or great bodily injury.  A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.' [Citation.]"  (*People v. Butler* (2000) 85 Cal.App.4th 745, 752.)  The threat must be such as to cause the person threatened to fear for his or her safety or that of his or her immediate family.  That element "has a subjective and an objective component.  A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances."  (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140.)  "[S]ustained" in this context "means a period of time that extends beyond what is momentary, fleeting, or transitory."  (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)

Pointing to Cristino's testimony that he was not afraid of anyone and similar statements, Velasquez-Quinonez claims the evidence was legally insufficient to establish the element of sustained fear.  As we have previously stated, however, we are required to review the evidence *as a whole*.  Cristino testified he believed Velasquez-Quinonez had a gun.  Although he stated he was not scared for himself, he testified he was scared for his brother and his brother's family, particularly the small children who were at the house that night.[34]  Cristino admitted he did not want to come to trial and that, had the prosecutor not obtained a warrant for his arrest, Cristino would not be there.  Gomez testified that when he first contacted Cristino on the date of the incident, Cristino

---

[34]    Cristino's brother and the brother's family fall within the definition of "'immediate family'" contained in section 422, subdivision (b).

appeared nervous or scared. He still appeared that way during the third interview, which took place a number of hours after the incident. During the recorded interviews, Cristino told Gomez he took the threats seriously and was scared something might happen. During the third interview, Cristino told Gomez he was still worried.

Conflicts, contradictions, and discrepancies in witnesses' testimony "raise only evidentiary issues that are for the jury to resolve. [Citation.]" (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1259.) The evidence here amply supports a conclusion Velasquez-Quinonez's threats caused Cristino to be in fear for a period of time that was more than just momentary, fleeting, or transitory (*People v. Allen*, *supra*, 33 Cal.App.4th at p. 1156), and that the fear was reasonable under the circumstances (see *People v. Ortiz* (2002) 101 Cal.App.4th 410, 417). Accordingly, Velasquez-Quinonez's conviction on count 2 is supported by substantial evidence.

## C.    Substantive Gang Crime and Enhancements

As previously described, Velasquez-Quinonez was convicted of actively participating in a criminal street gang. (§ 186.22, subd. (a).)[35] Subdivision (a) of section 186.22 provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment …."

---

[35]    Subdivision (a) of section 186.22 contains a substantive offense, while subdivision (b) of the statute describes a sentence enhancement. Section 186.22 has undergone many changes over the years. Although we consider the statutory version in effect when the crimes in the present case were committed (*People v. Gardeley* (1996) 14 Cal.4th 605, 615 (*Gardeley*)), the portions of the statute that are pertinent to this appeal are the same now as they were then.

With respect to each other offense or offenses of which defendants were convicted, the jury found true an enhancement allegation pursuant to section 186.22, subdivision (b)(1). That subdivision provides, with exceptions not pertinent here: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished [as specified elsewhere in the subdivision]."

Defendants now claim the evidence was insufficient to support the gang crime and enhancements for various reasons. Since both subdivisions (a) and (b) of section 186.22 require that the People prove the existence of a criminal street gang, as that term is defined by the California Street Terrorism Enforcement and Prevention Act (the STEP Act, § 186.20 et seq.; see *People v. Fiu* (2008) 165 Cal.App.4th 360, 387), we consider that issue first.

1.    Existence of a Criminal Street Gang

The STEP Act "defines 'criminal street gang' as any ongoing association that consists of three or more persons, that has a common name or common identifying sign or symbol, that has as one of its 'primary activities' the commission of certain specified criminal offenses, and that engages through its members in a 'pattern of criminal gang activity.' ([§ 186.22], subd. (f), italics [omitted].) A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' specified criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.' (*Id*., subd. (e).)" (*People v. Loeun* (1997) 17 Cal.4th 1, 4.) "Thus, for a group to fall within the statutory definition of a 'criminal street gang,' these requirements must be met: (1) the group must be an ongoing association of three or more persons sharing a common name or common

36.

identifying sign or symbol; (2) one of the group's primary activities must be the commission of one of the specified predicate offenses; and (3) the group's members must 'engage in or have engaged in a pattern of criminal gang activity.' [Citations.]" (*Id*. at p. 8.)

A pattern of criminal gang activity can by proven, inter alia, through evidence of the charged offense and another offense committed on a prior occasion by the defendant's fellow gang member (*Gardeley*, *supra*, 14 Cal.4th at p. 625) or by evidence of the offense with which the defendant currently is charged and proof of another offense committed on the same occasion by a fellow gang member (*People v. Loeun*, *supra*, 17 Cal.4th at p. 5). A predicate offense can be established by evidence of an offense the defendant committed on another occasion. (*People v. Tran* (2011) 51 Cal.4th 1040, 1044.)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members.… [¶] Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony .…" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323-324.) The "primary activities" requirement can be met by proof of either prior conduct or acts committed at the time of the charged offenses. (*Id*. at p. 323.)

If the prosecution's theory of why a criminal street gang exists turns on the conduct of one or more gang subsets, the prosecution is required "to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang. The prosecution has significant discretion in how it proves this associational or organizational connection to exist .… Yet when the prosecution … establishes the commission of the required predicate offenses with evidence of crimes

37.

committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*People v. Prunty* (2015) 62 Cal.4th 59, 67-68; see *People v. Williams* (2008) 167 Cal.App.4th 983, 987-989.)

Although defendants' briefs are not clear, it appears defendants both claim the prosecution failed to establish a sufficient connection to support a finding that Sureños are a criminal street gang controlling all Southern Hispanic gangs, and so it did not establish the requisite predicate offenses. As the Attorney General points out, however, Lamont 13 — not some overall Sureño organization — was the group upon which the prosecutor relied to establish the existence of a criminal street gang within the meaning of section 186.22, subdivision (f). Contrary to defendants' assertion, the admission of Bravo's testimony concerning Southern Hispanic gangs in general does not change this. Accordingly, we look to the evidence to determine whether it is sufficient to prove Lamont 13 constitutes a criminal street gang within the meaning of the STEP Act.[36]

---

[36]     In her reply brief, the Attorney General observed defendants did not argue there was insufficient evidence to support a finding Lamont 13 was a criminal street gang, and so any such argument they raised for the first time in their reply briefs would be forfeited. Velasquez-Quinonez's appellate counsel then requested permission to file a second supplemental opening brief, in which she sought to argue the prosecution did not establish that Lamont 13 is a criminal street gang, and that the evidence was insufficient to establish that the commission of one of the offenses listed by the trial court in its instructions to the jury was one of the primary activities of a criminal street gang. We granted permission to file the brief, and afforded the Attorney General time in which to file a supplemental respondent's brief. The Attorney General now argues the claims in Velasquez-Quinonez's second supplemental opening brief are equivalent to points raised for the first time in a reply brief, and so should be found to constitute an abuse of the procedures allowed by rule 8.200(a)(4) of the California Rules of Court (which requires the presiding justice's permission to file a supplemental brief except in circumstances not present here), and stricken.

We deny the Attorney General's request. We recognize all briefing must end at some point, and that the rule affording a mechanism by which a party may obtain permission to file a supplemental brief can be abused. Nevertheless, arguments made for the first time in a reply brief will not be entertained due to the unfairness to the other party. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 25; *People v. Tully* (2012) 54

The gang-related evidence is set out in detail, *ante*. We conclude it is sufficient to establish Lamont 13 as a criminal street gang as that term is defined by section 186.22, subdivision (f). We see no material difference between the quality and quantity of expert gang testimony found sufficient in *People v. Nguyen* (2015) 61 Cal.4th 1015, 1068 and *Gardeley*, *supra*, 14 Cal.4th at pages 619 through 620 and 624 through 625, which in turn was referenced in *People v. Sengpadychith*, *supra*, 26 Cal.4th at page 324, to provide a basis from which the jury reasonably could find Lamont 13 met the statutory requirements, and that presented here.[37]

We recognize Bravo had only testified in court proceedings approximately four times as an expert on criminal street gangs, and that only one of those times (the preliminary hearing in this case) involved Lamont 13. However, "[a] person is qualified to testify as an expert if the person has 'special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates.' [Citation.] The determination that a witness qualifies as an expert and the decision to admit expert testimony are within the discretion of the trial court and will not be disturbed without a showing of manifest abuse. [Citation.] 'Error regarding a

Cal.4th 952, 1075.) No such unfairness to the Attorney General resulted here, because she was given ample opportunity to respond, and she did in fact respond.

In a footnote in her second supplemental respondent's brief, the Attorney General requests that we take judicial notice of the docket entries in this case. That request is not properly before us, as it does not comply with California Rules of Court, rule 8.252(a). Accordingly, we decline to rule on the request.

[37] The crimes Bravo testified were some of Lamont 13's primary activities — assaults with firearms, robberies, sale and possession for sale of narcotics, witness intimidation, and possession and carrying of firearms — are among the statutorily enumerated predicate offenses. (§ 186.22, subd. (e)(1), (2), (4), (8), (23) & (31)-(33).) The jury was instructed on commission of assault with a deadly weapon, assault by means of force likely to produce great bodily injury, burglary, transportation of a controlled substance, possession for sale of a controlled substance, unlawful possession of a firearm, carrying a loaded firearm, intimidation of a witness, and criminal threats with respect to both the primary activities and pattern of criminal gang activity elements.

witness's qualifications as an expert will be found only if the evidence shows that the witness "'"*clearly lacks* qualification as an expert."'" [Citation.]' [Citation.]" (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1118.)

Here, Bravo testified concerning his training and experience in relation to gangs, including Lamont 13; his first contact with the gang; his having spoken with members of Lamont 13; and his having investigated crimes associated with that gang. He also gave specific testimony about predicate offenses. Although Bravo's experience and training may not have been as extensive as gang experts in other cases, the trial court did not abuse its discretion in allowing him to testify as a gang expert. (See *People v. Montes* (2014) 58 Cal.4th 809, 861 [in light of officer's experience, training, and specific knowledge of gang involved in case, trial court did not abuse its discretion in permitting officer to testify as gang expert, despite the fact officer had never before qualified to testify in court as gang expert].) In sum, substantial evidence supports the conclusion Lamont 13 is a criminal street gang within the meaning of section 186.22. (See, e.g., *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330; *In re Ramon T.* (1997) 57 Cal.App.4th 201, 207.)

2.    The Substantive Gang Offense

The substantive offense defined in section 186.22, subdivision (a) "has three elements: (1) '[a]ctive participation in a criminal street gang, in the sense of participation that is more than nominal or passive,' (2) '"knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,"' and (3) 'the person "willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." [Citation.]' [Citation.]" (*People v. Mesa* (2012) 54 Cal.4th 191, 197, quoting *People v. Lamas* (2007) 42 Cal.4th 516, 523.) Velasquez-Quinonez alleges a lack of proof of the "'[a]ctive participation'" element.

"A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22[, subdivision ](a). [Citation.]" (*People v.*

40.

*Rodriguez* (2012) 55 Cal.4th 1125, 1130 (lead opn. of Corrigan, J.).) As provided by subdivision (i) of the statute: "In order to secure a conviction …, pursuant to subdivision (a) it is not necessary for the prosecution to prove that the person devotes all, or a substantial part, of his or her time or efforts to the criminal street gang, nor is it necessary to prove that the person is a member of the criminal street gang. Active participation in the criminal street gang is all that is required." Mere membership in a gang is not enough (*Gardeley*, *supra*, 14 Cal.4th at p. 623); on the other hand, the person need neither occupy a leadership position in the gang or even devote a substantial part of his time and efforts to the gang (*People v. Castenada* (2000) 23 Cal.4th 743, 747). Rather, "one 'actively participates' in some enterprise or activity by taking part in it in a manner that is not passive." (*Ibid.*) In addition, the defendant's active participation must be shown to have occurred at or reasonably near the time of the crime(s). (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509.)

In the present case, the evidence showed Lopez and Zaragoza were documented members of Lamont 13, and in fact were two of the more feared and influential members of that gang. In October 2011, defendants were contacted in the presence of Zaragoza, another Lamont 13 member and a member of another Southern Hispanic gang, and Zaragoza claimed Lamont 13 during that contact. Cristino saw Velasquez-Quinonez associating with Zaragoza sometime before the events that gave rise to the current charges. Although Velasquez-Quinonez apparently did not have a gang moniker, he did have a three-dot tattoo that was found almost exclusively on Southern Hispanic gang members. In three separate jail bookings, including the one for this case, Velasquez-Quinonez claimed "South" and asked to be kept away from "North."[38] Most significant

---

**38**     The trial court limited the prosecutor to three bookings.

We address defendants' claim their booking statements were improperly admitted, *post*. When considering a sufficiency-of-the-evidence claim, we consider all the evidence admitted at trial, even if some was admitted erroneously. (*McDaniel v. Brown*

41.

were the circumstances of the charged offenses, in which Velasquez-Quinonez engaged in conduct, within the traditional boundaries of Lamont 13, that is commonly engaged in by Lamont 13 members; did so with another Southern Hispanic gang member; used terms common (and, with respect to "homie," very meaningful) to gang members; and acted on behalf or in support of one of the most influential members of Lamont 13, while indicating that the order was coming from "higher up."

Under the circumstances, jurors reasonably could have concluded Velasquez-Quinonez participated in Lamont 13 in a manner that was more than nominal or passive. The sufficiency of the evidence in this regard is not altered by the existence of other evidence (such as the lack of gang moniker and gang-related convictions) to which Velasquez-Quinonez points to show he was not an active participant in the gang. "Resolution of conflicting evidence and credibility issues was for the jury to decide. [Citation.] It is clear from the verdict finding [Velasquez-Quinonez] guilty of street terrorism that the jury believed he was actively participating in the gang. Because substantial evidence supports this determination, '"that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]" [Citation.]' [Citation.]" (*People v. Martinez*, *supra*, 158 Cal.App.4th at p. 1331.)

### 3. The Gang Enhancements

The gang enhancements required proof defendants committed the substantive offense(s) (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1), (4).) "[T]he Legislature included the requirement that the crime to be enhanced be committed for the benefit of, at the

---

(2010) 558 U.S. 120, 131; see *People v. Cooper* (2007) 149 Cal.App.4th 500, 507-508, 522-523.)

direction of, or in association with a criminal street gang to make it 'clear that a criminal offense is subject to increased punishment under the STEP Act only if the crime is "gang related."' [Citation.] Not every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) A crime *is* gang related, however, if, inter alia, it is committed in association with the gang, or it is committed for the benefit of the gang. (*Ibid.*)

In *Albillar*, the California Supreme Court found the charged sex offenses were committed "in association" with a gang because the record supported a finding the defendants "relied on their common gang membership and the apparatus of the gang" in committing the crimes. (*Albillar*, *supra*, 51 Cal.4th at p. 60.) Defendants say this showing was not made in the present case, as the evidence did not show they belonged to the same gang, and mere commission of a crime with another gang member does not establish the "in association" element. We need not decide whether we agree, since the requirements of the first prong of the gang enhancement are listed in the disjunctive: If the crime was committed for the benefit of a criminal street gang, it need not, under the plain language of the statute, also have been committed in association with the gang. A defendant is not required to be an active or a current member of the criminal street gang that benefited from his or her crime(s). (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402.)

The record overwhelmingly supports a conclusion defendants sought to terrorize Cristino for his perceived role in cooperating with law enforcement in connection with the Lazy Bear shooting, and to dissuade him from testifying against Zaragoza and Lopez in the future. We fail to see how dissuading a witness from testifying against, or terrorizing him in retaliation for his perceived actions that adversely affected, two of the more feared and influential members of a gang could be found *not* to benefit the gang.

Turning to the specific intent requirement, the prosecution had to prove defendants acted "with the specific intent to promote, further, or assist in any criminal conduct by

43.

gang members." (§ 186.22, subd. (b)(1), (4).) The criminal conduct to which this segment of the statute refers encompasses the current offenses. (*Albillar*, *supra*, 51 Cal.4th at pp. 65-67.) There was sufficient substantial evidence from which jurors could conclude defendants each participated in one or more of the crimes against Cristino; did so with the specific intent to promote, further, or assist the other's criminal conduct; and knew the other to be a gang member and at least an associate of Lamont 13. That defendants may have been members of different gangs is immaterial, since, although a lone actor cannot violate subdivision (a) of section 186.22, the same limitation does not preclude enhancement of his or her sentence under subdivision (b) of that statute. (*People v. Rodriguez, supra*, 55 Cal.4th at pp. 1138-1139 (lead opn. of Corrigan. J.; see *id*. at pp. 1140-1141 (conc. opn. of Baxter, J.); *People v. Rios* (2013) 222 Cal.App.4th 542, 546, 564.) It logically follows that a gang enhancement can be applied to a gang member acting with a nongang member or, as here, with a member or associate of a different gang.

## II

### *MIRANDA*

Defendants contend the trial court violated their rights under the Fifth Amendment to the United States Constitution, as delineated in *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), by admitting evidence of booking statements concerning their gang alliance that were made without benefit of *Miranda* warnings and waiver of rights. Both say any failure to object should be excused since any objection would have been futile and was not supported by then-existing case law; alternatively, they say their trial attorneys were ineffective for failing to object. We conclude admission of the evidence was error (with one exception), but was harmless beyond a reasonable doubt. Accordingly, we do not reach the claims of ineffective assistance of counsel.

## A.    Background

Velasquez-Quinonez made the following in limine motion: "To exclude [Velasquez-Quinonez's] bookings, infield contacts/street checks, and related reports. The number and nature of the housing status at Lerdo (bookings) and conversations, infield contacts/street checks, and related reports show a propensity/disposition of the defendant's bad character, prior bad acts, and uncharged offenses. Miranda v. Arizona (1966) 384 U.S. 436, Inadmissible character evidence, more prejudicial than probative, (*Evidence Code § 210,1101, 352, 351*)." (*Sic*.) Morales moved, in limine, for severance or bifurcation of the gang enhancements, to exclude any reference to Morales being a member of the Colonia Chiques, and to exclude under *Miranda* all evidence of any statements made by Morales. During argument on the motion, counsel for Velasquez-Quinonez argued that because Velasquez-Quinonez only claimed South, the bookings were not indicative of gang affiliation. The trial court subsequently ruled, as to both defendants, it would allow information relative to bookings, but limit the number to whichever three the prosecutor wanted to use.

During an Evidence Code section 402 hearing, Morrison testified that when defendants were arrested after the traffic stop, he read them their *Miranda* rights. Velasquez-Quinonez invoked his rights to silence and counsel. Morales, however, indicated he understood his rights and agreed to continue speaking with Morrison. Morales's waiver of his rights and the content of his interview with Morrison, but not Velasquez-Quinonez's invocation, were presented to the jury. Morrison further testified that he observed the inputting of data into the computer when defendants were booked into jail. When Morales was asked if he was with any gangs, he said he was a Southerner with the Colonia Chiques. Velasquez-Quinonez claimed he was a southern gang member, but no specific clique. Morrison observed a C tattooed on the left side of Morales's neck, and three dots tattooed on Velasquez-Quinonez's left wrist.

45.

Prior to the testimony of Deputy Velasquez, the prosecutor made an offer of proof Velasquez would testify that when asked if he associated with gangs, Morales said yes, with South Colonia Chiques from Oxnard. The court asked Morales's attorney if he had any objection to the evidence. This ensued:

"[MORALES'S ATTORNEY]: Your Honor, if it was a booking question, I don't have any objection. And if that's what the representation is that, then, I don't have any objection as long as it is a booking question.

"THE COURT: Well, the law appears to be — that is most of the booking questions aren't the type that require Miranda.

"[MORALES'S ATTORNEY]: I agree, Your Honor.

"THE COURT: But you would be entitled to a 402 hearing if you have some reason to believe that other than perhaps that would not amount to a booking question."

Morales's attorney conferred privately with Morales. He then told the court: "Your Honor, he's expressing to me that there's some reason to believe that I could take him on cross — with him, but in terms of — it was a booking." Velasquez then testified to statements Morales made to him while being booked into jail on October 7, 2011, as set out in the statement of facts, *ante*.

Bravo subsequently testified that in preparation for forming an opinion whether Morales was an associate or member of Lamont 13, he reviewed Morales's tattoos, bookings, field identification cards, incident reports involving Morales, and the report for the charged offenses. Bravo then described three bookings that took place on November 16, 2006, October 7, 2011, and September 3. In each, Morales claimed South as the gang and either South or Colonia Chiques as the clique. With respect to Velasquez-Quinonez, Bravo reviewed incident reports, booking information, a field contact, and information about tattoos. During the bookings, which occurred on November 5, 2009, November 13, 2011, and September 3, Velasquez-Quinonez claimed South for both the gang and the clique.

**B.     Analysis**

"Under the rule of *Miranda*[, *supra*,] 384 U.S. [at pages] 478-479 …, certain admonitions must be given before a suspect's statement made during custodial interrogation can be admitted in the prosecution's case-in-chief." (*People v. Elizalde* (2015) 61 Cal.4th 523, 527 (*Elizalde*).)  "[C]ustodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda*, *supra*, 384 U.S. at p. 444, fn. omitted.)  "[I]nterrogation" means express questioning or its functional equivalent, to wit, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301, fns. omitted (*Innis*).)  An incriminating response is any response, whether inculpatory or exculpatory, the prosecution may seek to introduce at trial.  (*Id*. at p. 301, fn. 5.)

In *Pennsylvania v. Muniz* (1990) 496 U.S. 582 (*Muniz*), a plurality of the United States Supreme Court recognized "a 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the '"biographical data necessary to complete booking or pretrial services."' [Citation.]" (*Id*. at p. 601 (plur. opn. of Brennan, J.).)  The court cautioned that "'[r]ecognizing a "booking exception" to *Miranda* does not mean … that any question asked during the booking process falls within that exception.  Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.' [Citations.]" (*Id*. at p. 602, fn. 14.)

At the time of defendants' trial, application of the booking question exception to booking interview questions and answers about gang affiliation was not completely settled, although such questions and answers generally were found to fall within the purview of the exception.  As *People v. Gomez* (2011) 192 Cal.App.4th 609 (*Gomez*)

explained: "[W]hether a question about a suspect's gang affiliation during a booking interview is encompassed by the booking question exception depends upon whether, under all the facts and circumstances, the question was designed to elicit an incriminating response." (*Id.* at p. 627.)  The Court of Appeal advised:  "In determining whether a question is within the booking question exception, courts should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information.  [Citation.]  Courts have considered several factors, including the nature of the questions, such as whether they seek merely identifying data necessary for booking [citations]; the context of the interrogation, such as whether the questions were asked during a noninvestigative clerical booking process and pursuant to a standard booking form or questionnaire [citations]; the knowledge and intent of the government agent asking the questions [citations]; the relationship between the question asked and the crime the defendant was suspected of committing [citations]; the administrative need for the information sought [citations]; and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the guise or pretext of seeking routine biographical information [citations]." (*Id.* at pp. 630-631.)

Well after defendants' trial was finished, the California Supreme Court disapproved *Gomez*.  (*Elizalde*, *supra*, 61 Cal.4th at p. 538, fn. 9.)  In *Elizalde*, the state high court considered whether routine questions about gang affiliation, posed to the defendant while he was being processed into jail on murder charges, fell within the booking exception.  (*Id.* at p. 527.)  The court held:  "[T]he questions exceeded the scope of the exception and … officers should have known these questions were reasonably likely to elicit an incriminating response because of California's criminal gang statutes and [the] defendant's pending charges.  While officers were permitted to ask these questions for institutional security purposes, [the] defendant's un-*Mirandized* responses were inadmissible against him during the [prosecution's] case-in-chief." (*Ibid.*)

The state Supreme Court declined to delineate the scope of the booking exception in all circumstances, but determined "that questions about gang affiliation exceed it." (*Elizalde*, *supra*, 61 Cal.4th at p. 535.)  The court reasoned that gang affiliation questions do not conform to the narrow exception contemplated by *Muniz* for basic identifying biographical data; hence, they must be assessed under the *Innis* definition of "'interrogation'" as "questions the police should know are 'reasonably likely to elicit an incriminating response.' [Citation.]" (*Elizalde*, *supra*, 61 Cal.4th at p. 538.)  Applying that test, and considering California's comprehensive scheme of penal statutes aimed at eliminating criminal activity by street gangs, under which substantial punishment could result, the court concluded the gang affiliations questions posed to the defendant were reasonably likely to elicit an incriminating response. (*Id*. at pp. 538-539.)  Furthermore, "[t]his likelihood was apparent even if the deputies' subjective intention was benign. Accordingly, [the defendant's] unadmonished answers to these questions were inadmissible at trial." (*Id*. at p. 540.)

*Elizalde* was decided after the parties' briefs were filed in the present case.  The Attorney General has taken the position defendants' *Miranda* claims were not preserved for appeal because defendants failed to make a *Miranda* objection with sufficient specificity in the trial court. (See, e.g., *People v. Mattson* (1990) 50 Cal.3d 826, 853-854, superseded by statute on another ground as stated in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13; *People v. Bonin* (1989) 47 Cal.3d 808, 845.)  A party need not object, however, if doing so would be futile. (*People v. Chism* (2014) 58 Cal.4th 1266, 1291; *People v. Wilson* (2008) 44 Cal.4th 758, 793.)

Given the law on the subject at the time of trial and the trial court's comments, we cannot say with any certainty whether an objection would have been futile.  Under the circumstances, and in light of *Elizalde*, we find it fairer to all parties and more expeditious to consider the issue on the merits, rather than find it forfeited and deal with the ensuing claims of ineffective assistance of counsel.  Accordingly, pursuant to

*Elizalde*, we conclude it was error to admit, in the prosecution's case-in-chief, evidence of defendants' gang affiliation elicited during booking interviews that were not shown to have followed defendants' advisement and waiver of rights under *Miranda*.

We turn, then, to the question of prejudice. The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment/*Miranda* is assessed under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*Elizalde*, *supra*, 61 Cal.4th at p. 542; *People v. Davis* (2009) 46 Cal.4th 539, 598.) "That test requires the People here 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.]" (*Elizalde*, *supra*, at p. 542.)

We conclude that burden is satisfied. Morales claimed South and Colonia Chiques when booked for the current offenses, not long after he was advised of, and waived, his *Miranda* rights. More importantly, Bravo testified booking information was only one of the things he considered in forming his opinions. In the present case, evidence of defendants' tattoos, street checks, reports of prior contacts and incidents, and particularly the circumstances of the charged offenses pointed unerringly to defendants being Southern Hispanic gang members and Morales belonging to Colonia Chiques. In light of the other independent evidence, the booking information actually was favorable to defendants, because it allowed them to argue neither ever admitted any affiliation with Lamont 13. Under the circumstances, the erroneous admission of defendants' challenged statements was harmless beyond a reasonable doubt.

### III

#### <u>IN-CAMERA PROCEEDINGS</u>

Morales filed a motion in limine seeking to have the prosecutor disclose promises and agreements between law enforcement and Cristino. The motion was based on the fact that, during his recorded interview with Gomez, Cristino mentioned several deputies by name, suggesting the possibility of a preexisting relationship. Velasquez-Quinonez

joined. The court directed the prosecutor to find out if there were any promises of leniency or inducements or if Cristino was involved in anything that related to him being a witness in this case. At the next hearing on the motion, the prosecutor stated his understanding that there were no such agreements pertaining to this case, although he did not know all the details about Cristino's relationship, if any, with law enforcement. The prosecutor noted he had Gomez available and preferred to take it up in camera. The court clarified with counsel that they were concerned about any agreements or promises of leniency, even if they were not relative to this case. The court agreed to conduct an in camera hearing, following which it stated it would order disclosed any agreements or promises that were relevant to Cristino's testimony in this case, should any exist. After the in camera hearing, the defense motion for disclosure was denied.

Defendants now ask us to review the in camera proceeding, in light of due process principles that may have been jeopardized. The Attorney General has no objection to our doing so.

We have reviewed the transcript of the in camera proceeding in light of the applicable law. (See *People v. Avila* (2006) 38 Cal.4th 491, 606.) There was no information that was material to the defense and so should have been disclosed. (See generally *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678-680; *Davis v. Alaska* (1974) 415 U.S. 308, 316-317; *People v. Martinez* (2009) 47 Cal.4th 399, 453-454; *In re Sodersten* (2007) 146 Cal.App.4th 1163, 1225-1227.) Accordingly, defendants' motion was properly denied.

## IV

### LACK OF UNANIMITY INSTRUCTION

Velasquez-Quinonez contends that, because counts 1 and 2 could have been based on the September 3 incident or the texts and other messages Cristino said he received from Velasquez-Quinonez in the months before then, a unanimity instruction was

required.**39**  The Attorney General disagrees, arguing the prosecutor elected which act constituted which count.

## A.    Background

In his opening statement, the prosecutor told jurors the case was about two gang members trying to intimidate Cristino because they believed he was a witness in a recent gang shooting.  The prosecutor then detailed what he believed the evidence would show with respect to the events of September 3.  The prosecutor said nothing about texts or other messages Cristino received before then.

Cristino testified, inter alia, that he received a number of messages from Velasquez-Quinonez before Velasquez-Quinonez approached him on September 3.  Cristino knew they were from Velasquez-Quinonez because the voice was recorded.  They said the same thing, that the orders came from higher up, that rats like Cristino had to disappear, and that it was Velasquez-Quinonez's mission to finish them all.  Cristino did not remember when he last received one of the messages, but it was probably weeks before September 3.  Having received the messages, when defendants showed up at his house on September 3 and Velasquez-Quinonez was threatening him, Cristino said this was the reason Velasquez-Quinonez had come.  There was music in some of the messages, with the words "iron, iron" and "that's my mission," and Velasquez-Quinonez threatened to kill Cristino in at least one.  Velasquez-Quinonez had been sending Cristino the messages for about three months.  Cristino could not recall if he received any of them before the date of the Lazy Bear shooting.

The prosecutor commenced his opening argument as follows:

"Fuck that, I know where that mother fucker works.  Words of the defendant, Oscar Ivan Velasquez-Quinonez as he's being transported to the Kern County Jail on September 3rd, 2012.  [Cristino] Berrelleza didn't

---

**39**     Velasquez-Quinonez does not contend the instruction was required due to the calls he made from jail after his arrest in this case.

52.

deserve to be confronted that night. He didn't deserve to be threatened. He just wanted to have a meal. He came back from his girlfriend's house. He wanted to eat outside, so he didn't disturb anybody. The last thing he needed was the defendant Mr. Velasquez[-Quinonez] and his homie. Mr. Morales coming to his brother's residence, causing a stir threatening him, threatening to shoot him.… [¶] … [¶]

"… [Velasquez-Quinonez] goes and threatens [Cristino] after having left him multiple phone messages whether they be voicemail messages and/or text messages.

"He shows up and it happens to be a few days before a preliminary hearing scheduled for Daniel Zaragoza. You will have this exhibit to look at and peruse through in the back. This is a certified transcript of Daniel Zaragoza's court case and there was a preliminary hearing scheduled for September 6th. This incident happens on September 3rd .… So [Velasquez-Quinonez] gets this idea that it's [Cristino's] fault. He goes over to [Cristino's] house. He doesn't go alone and he has his homie Mr. Morales to support him."

The prosecutor then proceeded to describe what happened on September 3. He told the jury, "We know what happened the early morning hours of September 3rd." He then turned to the elements of section 136.1, the first of which was "the defendant maliciously tried to prevent or discourage Cristino Berrelleza from attending or giving testimony at trial." He stated: "We … know that [Velasquez-Quinonez] is threatening to kill [Cristino] for putting the homie in jail. We know from that docket that I showed you that the homie is in jail, and we also know that there's a preliminary hearing coming up three days later for the homie."

The prosecutor subsequently turned to the jury instruction for violating section 422. In part, the prosecutor stated: "There should be no doubt that [Cristino] was threatened by Mr. Velasquez[-Quinonez]. I'm going to kill you. I will see you any time. I'm going to kill you. The gun is ready for you. I'm going to shoot you. [¶] … [¶] … The threat was clear and Mr. Velasquez[-Quinonez] wanted to shoot him that night. At some point, he decides there's too many witnesses. This is probably after [Cristino's] brother is awake and is at the door. [¶] It's only at the time that when Mr. Velasquez[-

Quinonez] and everybody is leaving that he says, okay, meet me at the park. There's too many people here, meet me at the park at 12 o'clock. But before that, he was telling [Cristino] he was going to kill him right then and there."

Neither party requested, and the trial court did not give, a unanimity instruction such as CALCRIM No. 3500.[40]

## B.     Analysis

"In a criminal case, a jury verdict must be unanimous. [Citations.] … Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Accordingly, cases have long held that "when the accusatory pleading charges a single criminal act and the evidence shows more than one such unlawful act, *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed … that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act. [Citations.]" (*People v. Gordon* (1985) 165 Cal.App.3d 839, 853, fns. omitted, disapproved on other grounds in *People v. Frazer* (1999) 21 Cal.4th 737, 765 & *People v. Lopez* (1998) 19 Cal.4th 282, 292; accord, *People v. Russo*, *supra*, at p. 1132.)

"The unanimity requirement is constitutionally rooted in the principle that a criminal defendant is entitled to a verdict in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged. [Citations.]" (*People v. Brown* (1996) 42 Cal.App.4th 1493, 1499-1500.) It "'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the

---

**40**     CALCRIM No. 3500 reads: "The defendant is charged with ___ <*insert description of alleged offense*> [in Count ___ ] [sometime during the period of ___ to ___ ]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

defendant committed'" (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132) as when, for example, the jury "'amalgamat[es] evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' [Citation.]" (*People v. Moore* (1989) 211 Cal.App.3d 1400, 1415.)

A trial court has a sua sponte duty to instruct on unanimity when the circumstances warrant and no election has been made. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.) A trial court's failure to so instruct is subject to our de novo review. (See *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

We conclude the circumstances of the case do not dictate giving the instruction. Although the prosecutor never expressly told the jury he was electing to rely on the events of September 3 as the basis for counts 1 and 2, he made clear his election in his opening statement. (See *People v. Mayer* (2003) 108 Cal.App.4th 403, 418.) He never backtracked from this election or even "muddied the waters" in his summation. (Compare *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292 with *People v. Melhado*, *supra*, 60 Cal.App.4th at pp. 1535-1536 & fn. 5.) Thus, his statements and arguments were an election for juror unanimity purposes. (*People v. Mayer*, *supra*, 108 Cal.App.4th at pp. 418-419.)

V

*MARSDEN*

Velasquez-Quinonez contends the trial court erred by denying his posttrial request to have new counsel appointed, pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). He says the error deprived him of his Sixth Amendment right to counsel.

## A. Background

Sentencing originally was set for February 15, 2013. On that date, it was continued to March 6, 2013. At the outset of the continued sentencing hearing, Velasquez-Quinonez informed the court that he wanted a *Marsden* motion and a new trial

based on ineffective assistance of counsel. The court proceeded to clear the courtroom. The court then asked Velasquez-Quinonez why he wanted a new attorney, and what the issues were between Velasquez-Quinonez and counsel such that Velasquez-Quinonez believed he had not received appropriate representation.[41]

Velasquez-Quinonez complained that he was the only one who knew what happened on the night in question, and he needed his side told.[42] Velasquez-Quinonez asserted that he wanted counsel to focus more on the wallet when questioning Cristino, and to ask more about the personal problems the two had had well before the shooting. Velasquez-Quinonez also wanted counsel to tell the jury that Velasquez-Quinonez worked for a living, contrary to most gang members, and that he had never been in trouble before.

Velasquez-Quinonez claimed he had wanted to testify, but counsel constantly advised him not to, despite the fact his only prior record consisted of a driving under the influence conviction. Velasquez-Quinonez acknowledged he made the decision during

---

[41] We recite the matters Velasquez-Quinonez raises on appeal. He voiced a number of other complaints about counsel during the *Marsden* hearing.

[42] During her opening statement, Velasquez-Quinonez's attorney told the jury: "[T]here was a dispute, a personal dispute between a nephew, Oscar Velasquez-Quinonez and his ex-uncle Cristino Berrelleza. Oscar, along with his friend Omar went to his ex-uncle's house Cristino on September 3rd. They were given a ride to Cristino's house by Cristino's son Chris. Chris gave them a ride to his dad's house so that Oscar and Omar could pick up Oscar's tools and his wallet with his ID in it. [¶] Once they get there, Oscar tries to ask his uncle for his tools, his wallet, and his ID back. It's not an easy situation. Oscar is fueled by alcohol and there's an implied accusation that his ex-uncle was a thief, that his ex-uncle stole his tools and stole his wallet. [¶] Oscar is not successful in getting his tools and wallet back. Chris drives Omar and Oscar away.… [L]ater they are stopped by deputies .… While Oscar is sitting in the back seat, he tells Chris not to listen to what the deputies are saying. He's laughing and he's saying don't listen to the deputies. [¶] … [¶] You're going to hear calls that he made to his mom while he is in jail and realizing the mistake that he made. And essentially he tells mom, hey, mom, go talk to Cristino's brother, and tell them, hey, I never went there to fight. I only went there to get my stuff back."

trial not to testify.[43]  Velasquez-Quinonez related that he later changed his mind and wanted to take the stand, but counsel said it was too late.  When Velasquez-Quinonez wanted to talk to the judge about it, counsel told him he could not.

Velasquez-Quinonez further claimed counsel knew Velasquez-Quinonez already had the tattoo of a clover before photographs were taken of his tattoos, and that it was old and faded, yet counsel never presented this evidence or the fact he had a spade tattooed on his other wrist.  Velasquez-Quinonez also related he had told his attorney that he had a skin condition, and although counsel asked Bravo if he knew Velasquez-Quinonez was handcuffed, she never presented evidence to explain why his wrist looked red and irritated.

Velasquez-Quinonez stated he was "really dissatisfied" when, during closing argument, counsel asked the jury to find him not guilty on counts 1, 3, 4, and 5, but did not include count 2.[44]  He asserted this essentially admitted his guilt.  He was also upset that, without his permission or knowledge, she showed two pictures of dogs and portrayed him to the jury as a drunken Chihuahua.  By saying "they" should have sent someone else, Velasquez-Quinonez claimed, counsel was insinuating someone sent him

---

**43**  While Bravo was still testifying, the court informed defendants that the final answer as to who got called as witnesses, what questions got asked, what evidence to produce, and the like, rested with the attorneys.  The final decision whether to testify, however, rested with defendants, even if their attorneys did not want them to testify.  Defendants both expressly stated they understood.  The court directed defendants to talk it over with their attorneys and think over their decisions.  The court subsequently confirmed with each defendant that he was not going to testify, he had discussed the matter with his attorney, it was his own personal decision, and he understood he had an absolute right to testify.

**44**  Counsel concluded her summation by arguing that proof beyond a reasonable doubt did not exist.  She stated:  "Don't have a doubt two weeks from now or two months from now when you're at the grocery store and you're driving down the freeway.  Resolve all the issues you have before you leave here, and I would ask you come back with a not guilty on all the gang enhancements and not guilty on Count 1, Count 3 and Count 4."

57.

and so confessed his guilt and argued against him.[45]  Velasquez-Quinonez also claimed counsel's opening statement was weak and incriminating, because counsel told the jury this was a story about a person who was drunk and obnoxious and laughing at the police. He asserted counsel failed to inform the jury that he had never been in trouble, but let the prosecution say bad things about him without objecting.  Velasquez-Quinonez asserted he never claimed South at booking, and that Morrison was too far away to hear what was said, but that defense counsel said she could not ask him about it.

---

[45]     In discussing the gang allegations, Velasquez-Quinonez's attorney argued why, in her view, the events of this case did not comport with the gang expert's testimony concerning how gang members were not allowed to show weakness and how gang protocol demanded that members bring attention to themselves and their gang, etc.  In part, she stated:  "And I want to suggest to you that [Velasquez-Quinonez's] conduct on September 3rd is inconsistent with being a gang member and how Lamont 13 gang members carry out their business.  He's not there on L13's behalf and he's not an L13. [¶]  [Cristino] mentioned something about the order coming from the top.…  Let's assume that L13 sent [Velasquez-Quinonez].  And what I submit to you is that on September 3rd, there was a small mouth yapping dog as the messenger.  The order came from the top or at the direction of another gang member, I submit to you that this was a messenger … that came to [Cristino's] house on September 3rd.  [¶]  It's a small mouth, a yapping dog, a yapping dog who is also smashed.  He was unsteady on his feet and he didn't speak clearly, and even [Cristino] said that [Velasquez-Quinonez] spoke like he was drunk.  Even more so, the dog came without a weapon.  The dog came at night and there were no witnesses around.  And most significantly this yapping little dog came and began to yap at [Cristino] and [Cristino] growled back, because [Cristino] challenged him.  [¶]  [Cristino] said, are you going to do it?  Do it and how does [Velasquez-Quinonez] react?  [Velasquez-Quinonez] doesn't have a gun.  What [Velasquez-Quinonez] does instead is he says, no, no, wait.  Come to the park tomorrow, okay?  And that is a big no, no, because the gang members can't be cowardly.…  [¶] … [¶]  Well, we know that [Velasquez-Quinonez] did leave and he can do that, because he's not a gang member.  He's not L13.  He has no reputation to lose.…  [¶]  I would suggest to you that there are better ways to send a message and there are better messengers .…  [¶]  I would submit to you that there's no benefits in having a drunk yapping messenger come at night without arming himself to send a message to his own uncle and without publicizing it."

Velasquez-Quinonez also faulted counsel for failing to bring in witnesses, particularly Chris, and for failing to bring up what happened to Cristino's "video confession" about working with the police.

The court then asked counsel to respond. She claimed assertions she prevented Velasquez-Quinonez from testifying were false. She represented that she advised him that he had the absolute right to testify, although she told him that if he did take the stand, it would not help him. She also represented there was no indication by Velasquez-Quinonez, after the court talked to him about his right to testify, that Velasquez-Quinonez wanted to testify, although she believed he may have wanted to testify after the verdict came in. She represented that she had an investigator attempt to contact Chris and other members of Velasquez-Quinonez's family, and that what she learned "perhaps [was] inconsistent" with what Velasquez-Quinonez was saying about problems that existed between him and Cristino before this incident. Her investigator was not able to contact Chris or Cristino. With respect to the clover tattoo, she believed the evidence she heard was "a little different." She did not believe any kind of video confession of Cristino existed, although the court asked the prosecutor at some point whether Cristino was involved in any kind of work with the district attorney's office or the police.

Velasquez-Quinonez asserted counsel was lying about when he wanted to testify. Velasquez-Quinonez represented he changed his mind the day after the court asked him about testifying. He claimed counsel told him the people who were testifying were trained professionals, and that if he wanted to lose, he should go ahead and take the stand. This scared Velasquez-Quinonez. Velasquez-Quinonez reiterated that counsel's argument led the jury to believe Velasquez-Quinonez was admitting count 2, when all the counts went hand-in-hand. Asked about count 2 by the court, counsel replied: "Your Honor, I do not specifically recall which counts. I asked the jury to find Mr. Velasquez-Quinonez guilty or not guilty and if it was for trial purposes, Your Honor."

59.

Velasquez-Quinonez claimed to have complained to his mother and cousins — Cristino's sons — before September 3 that Cristino had his wallet. He went to Cristino's house September 3 to get the wallet. Asked by the court if there were discussions about subpoenaing witnesses as to Velasquez-Quinonez's motive, counsel responded that an investigator did speak to various family members, but the investigator's findings were inconsistent with what Velasquez-Quinonez was saying.

The court found that issues concerning what questions should be asked of witnesses were matters of trial tactics, including with respect to the tattoo. It acknowledged there were conflicts between Velasquez-Quinonez and counsel in that regard, but found no basis for concluding counsel rendered ineffective assistance. It found no evidence counsel prevented Velasquez-Quinonez from testifying, and it found the facts concerning when Velasquez-Quinonez changed his mind to be as counsel stated, in light of the court's advisement to defendants with regard to their right to testify. With respect to the implicit admission of count 2 and stating Velasquez-Quinonez was sent by someone, the court found closing argument to have been a trial tactic on defense counsel's part. In sum, the court stated it did not find counsel had improperly represented Velasquez-Quinonez, nor did it find any breakdown in the attorney-client relationship was such that counsel could not represent Velasquez-Quinonez effectively at sentencing. Accordingly, it denied the motion.

## B.    Analysis

The applicable rules are well settled. """When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record *clearly* shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is

likely to result.'" [Citation.] The decision whether to grant a requested substitution is within the discretion of the trial court; appellate courts will not find an abuse of that discretion unless the failure to remove appointed counsel and appoint replacement counsel would '*substantially* impair' the defendant's right to effective assistance of counsel. [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 681, italics added, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; accord, *People v. Taylor* (2010) 48 Cal.4th 574, 599; *Marsden*, *supra*, 2 Cal.3d at p. 123.)

The same standard applies whether the *Marsden* motion is made preconviction or postconviction. (*People v. Smith* (1993) 6 Cal.4th 684, 694.) "'When, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request. [Citations.] If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a "colorable claim" of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial. [Citations.]' [Citation.]" (*Id.* at pp. 692-693.) Despite the use of the phrase "'colorable claim,'" the California Supreme Court has made it clear that "[a] defendant has no greater right to substitute counsel at the [postconviction] stage than the [preconviction stage]." (*Id.* at p. 694.)

In the present case, Velasquez-Quinonez moved to have new counsel appointed to bring a motion for new trial based on ineffective assistance of counsel. Thereafter, the trial court afforded him ample opportunity to explain the reasons for his request. (See *People v. Vera* (2004) 122 Cal.App.4th 970, 979.) Accordingly, we review the denial of Velasquez-Quinonez's motion for abuse of discretion. (*People v. Memro* (1995) 11 Cal.4th 786, 857; *People v. Vera*, *supra*, at p. 979.) "[D]iscretion is abused whenever the

court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72; see *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 [trial court abuses its discretion when factual findings critical to decision find no support in evidence].)

We conclude the trial court's ruling was reasonable, both with respect to counsel's purported inadequacies and any irreconcilable conflict between client and attorney. (See *People v. Memro*, *supra*, 11 Cal.4th at p. 857.) The court patiently permitted Velasquez-Quinonez to fully state his claims, seeking clarification where necessary for the court to ensure it understood Velasquez-Quinonez's true complaints. It inquired of defense counsel with respect to particular assertions by Velasquez-Quinonez, and solicited Velasquez-Quinonez's response after defense counsel addressed Velasquez-Quinonez's claims.

Many of Velasquez-Quinonez's complaints of counsel's purported inadequacy amounted to tactical disagreements. *Marsden* error will not be found under such circumstances. (*People v. Dickey* (2005) 35 Cal.4th 884, 922; *People v. Welch* (1999) 20 Cal.4th 701, 728-729.) Others related to matters occurring during trial, which the court could evaluate "based on its own observations." (*People v. Diaz* (1992) 3 Cal.4th 495, 574, fn. omitted.) Still others were belied by the record. Moreover, to the extent there was a credibility question between Velasquez-Quinonez and defense counsel, the trial court was entitled to accept counsel's explanations. (*People v. Smith*, *supra*, 6 Cal.4th at p. 696.)

The record shows Velasquez-Quinonez's attorney focused on the gang enhancements and allegations, a reasonable tactical decision under the circumstances. As to count 2, she chose to concede there was a confrontation, but then to call Cristino's credibility into question.[46] She asked some questions geared toward the scenario she

---

[46] That counsel apparently could not recall her actions or reasoning on this point does not mean her performance was deficient or she failed to pursue a reasonable trial

62.

posited in her opening statement, and the trial court accepted her representation that what Velasquez-Quinonez's family members told her was not consistent with Velasquez-Quinonez's representations. The court also found counsel credible concerning when Velasquez-Quinonez expressed a desire to testify. Moreover, contrary to Velasquez-Quinonez's claims, counsel did not tell jurors, in closing argument, that someone sent Velasquez-Quinonez; rather, she used Cristino's allusion to a barking dog to attempt to show how ridiculous the notion was that Velasquez-Quinonez was a gang member or sent by a gang. With respect to the tattoo, Calderon testified he saw three dots in a triangle formation on Velasquez-Quinonez's left wrist on October 22, 2011. Counsel may well have believed the question when the tattoo was changed was less important than the fact it was indeed changed. Again, as the trial court ruled, this was a matter of trial tactics.

We recognize Velasquez-Quinonez was not required to establish constitutionally inadequate representation at this stage. (*People v. Stewart* (1985) 171 Cal.App.3d 388, 395, disapproved on another ground in *People v. Smith*, *supra*, 6 Cal.4th at p. 694.) He was, however, required to establish that a failure to replace defense counsel would *substantially* impair his right to the assistance of counsel. (*People v. Smith*, *supra*, at pp. 690-691.) It is not enough for a defendant merely to show trial counsel could have done something differently. "A series of attorneys presenting groundless claims of incompetence at public expense, often causing delays to allow substitute counsel to become acquainted with the case, benefits no one. The court should deny a request for new counsel at any stage unless it is satisfied that the defendant has made the required showing. This lies within the exercise of the trial court's discretion, which will not be overturned on appeal absent a clear abuse of that discretion." (*Id*. at p. 696.)

---

tactic. Making concessions in an attempt to enhance credibility with the jury is a tactical choice that does not automatically constitute ineffective representation. (See *People v. Welch*, *supra*, 20 Cal.4th at p. 729.)

63.

Under the circumstances presented here, "'we find no basis for concluding that the trial court either failed to conduct a proper *Marsden* inquiry or abused its discretion in declining to substitute counsel.' [Citation.]" (*People v. Smith*, *supra*, 6 Cal.4th at p. 697, fn. omitted.)

## VI

### INEFFECTIVE ASSISTANCE OF COUNSEL

In a related vein, Velasquez-Quinonez contends his trial attorney rendered ineffective assistance by failing to present evidence of Velasquez-Quinonez's innocence at trial that she promised during her opening statement, and when she implicitly admitted guilt as to count 2.

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.) The defendant must prove prejudice as a "'demonstrable reality.'" (*People v. Williams* (1988) 44 Cal.3d 883, 937.) Mere speculation as to the effect of counsel's errors or omissions is not enough. (*Ibid.*)

"If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words,

"in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

## A.    Failure to Present Evidence Promised in Opening Statement

The pertinent portion of counsel's opening statement is set out in footnote 42, *ante*. Velasquez-Quinonez contends only three witnesses, other than Cristino, could testify to the facts set out by counsel: Velasquez-Quinonez, Chris, and Morales. The defense investigator could not locate Chris, and codefendant Morales was not subject to subpoena. That left Velasquez-Quinonez and, he asserts, he was willing to testify but counsel advised against it.

The record on appeal does not establish Velasquez-Quinonez was willing to testify in a timely manner, and in fact the trial court, in ruling on Velasquez-Quinonez's *Marsden* motion, implicitly found Velasquez-Quinonez not credible on this point. "[T]he decision to place a defendant on the stand is ordinarily within the competence and purview of trial counsel, but … a defendant who insists on testifying may not be deprived of doing so even though counsel objects. [Citation.] While the defendant has the right to testify over his attorney's objection, such right is subject to one significant condition: The defendant must timely and adequately assert his right to testify. [Citation.] … When the record fails to show such a demand, a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to his counsel his desire to testify, he was deprived of that opportunity. [Citation.]" (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1231-1232; accord, *People v. Alcala* (1992) 4 Cal.4th 742, 805-806.)

In any event, "[m]aking promises about the defense evidence in opening statement and then failing to deliver does not constitute ineffective assistance per se." (*People v. Burnett* (2003) 110 Cal.App.4th 868, 885.) Rather, it "is a fact-based determination that

must be assessed on a case-by-case basis. [Citation.] Foregoing the presentation of testimony or evidence promised in an opening statement can be a reasonable tactical decision, depending on the circumstances of the case. [Citations.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 955.)

Here, counsel neither told the jury Velasquez-Quinonez would testify nor promised a witness she did not produce. (Cf. *U.S. ex rel. Hampton v. Leibach* (7th Cir. 2003) 347 F.3d 219, 257-258; *Ouber v. Guarino* (1st Cir. 2002) 293 F.3d 19, 27; *Anderson v. Butler* (1st Cir. 1988) 858 F.2d 16, 17-19.) Rather, she gave her theory of the case. This theory was not implausible given the evidence actually produced, which included Velasquez-Quinonez telling his mother, in one of the recorded phone calls from jail, that he wanted to know why a bad man like Cristino was doing that to him as he went to get his tools and Cristino stole his wallet, and Cristino's somewhat suspect testimony that Velasquez-Quinonez threw his wallet on the ground in front of the house when he left after threatening Cristino. It was consistent with counsel's closing argument, which implicitly acknowledged a confrontation occurred, but claimed Velasquez-Quinonez was not a gang member or sent by any gang.

On the record before us, Velasquez-Quinonez has failed to establish both deficient performance and prejudice.

## B. Implicit Admission of Guilt on Count 2

The pertinent portion of counsel's closing arguing is set out in footnote 44, *ante*. Velasquez-Quinonez now contends counsel provided constitutionally deficient representation when she omitted count 2 from the charges of which she asked the jury to find Velasquez-Quinonez not guilty, and thereby implicitly admitted his guilt on count 2. Velasquez-Quinonez says count 2 was supported by facts that overlapped the other counts and enhancements, and that there was no reasonable basis to concede count 2 since, assuming Cristino received any of the described threats, he never experienced sustained fear.

"The right to effective assistance extends to closing arguments. [Citations.]" (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5.) Although it is not necessarily incompetent for an attorney to concede his or her client's guilt of a particular offense, defense counsel must not argue against his or her client. (*People v. Lucas* (1995) 12 Cal.4th 415, 446.) "Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his [or her] closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' [citation], but which issues to sharpen and how best to clarify them are questions with many reasonable answers." (*Yarborough v. Gentry*, *supra*, 540 U.S. at pp. 5-6.) "Judicial review of a defense attorney's summation is therefore highly deferential" (*id.* at p. 6), "and there is a 'strong presumption' that counsel's actions were sound trial strategy under the circumstances prevailing at trial. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 856.)

In the present case, Velasquez-Quinonez's attorney had to deal with Velasquez-Quinonez's statements to his mother in the recorded jail phone calls, including his admission he had gone to Cristino's house and the implication there was some kind of confrontation. She also had to consider Morrison's testimony that Velasquez-Quinonez asked, after his arrest, if Morrison was going to believe a crack head, and that he overheard Velasquez-Quinonez say, "[F]uck that. I know where that mother fucker works." In addition — and contrary to Velasquez-Quinonez's assertions — evidence Cristino experienced sustained fear was very strong. Although counts 1 and 2 were linked factually, counsel's implicit admission as to count 2 did not constitute an admission as to count 1; she chose to focus on attempting to persuade jurors the incident had nothing to do with a gang, and had she been successful, she very well might have convinced the jury there was no witness dissuasion.

The record on appeal does not disclose the reasons for counsel's decision to argue as she did. (*People v. Frye* (1998) 18 Cal.4th 894, 983, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22; *People v. Bell* (1989) 49 Cal.3d 502, 546.) It is not enough that, had counsel "chosen another path," she might have obtained a more favorable outcome. (*People v. Jennings*, *supra*, 53 Cal.3d at pp. 379-380.) Because we cannot conclude counsel could have had no reasonable tactical purpose, we cannot conclude counsel was ineffective. (See *People v. Hart* (1999) 20 Cal.4th 546, 631-632; *People v. Cain* (1995) 10 Cal.4th 1, 31.)

## VII

### SENTENCING ERRORS

**A.     Imposition of Life Term**

Section 186.22, subdivision (b)(1) provides for an indeterminate term of imprisonment under certain circumstances.[47] This court has previously held that an indeterminate term is allowed when a jury convicts a defendant of attempting to dissuade a witness by use of force, or by an express or implied threat of force or violence, pursuant to section 136.1, subdivision (c)(1),[48] or when a jury makes a finding defendant used an

---

[47]     Under subdivision (b)(1) of section 186.22, a gang enhancement is generally an additional term of two, three, or four years (*id.*, subd. (b)(1)(A)), five years if the underlying felony was a serious felony as defined in section 1192.7, subdivision (c) (§ 186.22, subd. (b)(1)(B)), or 10 years if the underlying felony was a violent felony as defined in section 667.5, subdivision (c) (§ 186.22, subd. (b)(1)(C)). Subdivision (b)(4) of section 186.22 provides one of the exceptions, and states, in pertinent part: "Any person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of: [¶] … [¶] (C) Imprisonment in the state prison for seven years, if the felony is … *threats to victims and witnesses, as defined in Section 136.1*." (Italics added.)

[48]     Subdivision (c) of section 136.1 provides in pertinent part: "Every person doing any of the acts described in subdivision (a) … knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment

68.

implied or express threat of force in committing the crime. (*People v. Lopez* (2012) 208 Cal.App.4th 1049, 1060-1061, 1064, 1065 (*Lopez*) [information charged, and jury found, a violation of § 136.1, subd. (a)(2), and enhancement pursuant to § 186.22, subd. (b)(1)], citing, *Cunningham v. California* (2007) 549 U.S. 270, 274-275 (*Cunningham*), *Blakely v. Washington* (2004) 542 U.S. 296, 303-304 (*Blakely*) & *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*); *People v. Anaya* (2013) 221 Cal.App.4th 252, 270 [phrase "threats to victims and witnesses" in § 186.22, subd. (b)(4)(C) refers to § 136.1, subd. (c)(1)], citing, *Alleyne v. United States* (2013) 570 U.S. ___ [133 S.Ct. 2151].)

Here, defendants were not convicted of violating section 136.1, subdivision (c)(1), nor did the jury make a finding they used an implied or express threat of force in committing the crime. Instead, they were charged in count 1 with violating section 136.1, subdivision (a)(1). Subdivision (a) of section 136.1 provides for punishment "by imprisonment in a county jail for not more than one year or in the state prison" for anyone who "[k]nowingly and maliciously" prevents or dissuades, or attempts to prevent or dissuade, "any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." (*Id*., subd. (a)(1), (2).)

The jury found defendants "guilty of Felony, to wit: Prevent or Dissuade a Witness/Victim from Giving Testimony, in violation of Section 136.1(a)(1) of the Penal Code, as charged in the first count of the Information." Jurors also found it to be true that the offense "was committed for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further or assist in criminal conduct by gang members, within the meaning of Penal Code Section 186.22(b)(1), as alleged in the first count of the Information."

---

in the state prison for two, three, or four years under any of the following circumstances: [¶] (1) *Where the act is accompanied by force or by an express or implied threat of force or violence*, upon a witness or victim or any third person or the property of any victim, witness, or any third person." (Italics added.)

69.

The probation officer's report asserted that the punishment for count 1, when enhanced under section 186.22, subdivision (b)(1), was an indeterminate term, and recommended sentences of seven years to life in prison pursuant to section 186.22, subdivision (b)(4)(C). The trial court imposed that sentence on each defendant.

Defendants contend they were denied their federal constitutional rights under the Sixth and Fourteenth Amendments when they were sentenced to an increased term under section 186.22, subdivision (b)(4)(C), based on facts not found true by the jury. The Attorney General concedes the issue. We accept the Attorney General's concession. Defendants' sentences on count 1 must be vacated and the matters remanded for resentencing.[49]

## B.    Calculation of Conduct Credits

At sentencing, the trial court awarded presentence conduct custody credits calculated subject to the 15 percent limitation contained in section 2933.1, subdivision (a)

---

[49]    No objection was required to preserve the issue for appeal. (See *People v. Scott* (1994) 9 Cal.4th 331, 354; *People v. Wilson* (2013) 219 Cal.App.4th 500, 518.)

*Apprendi* error, like failure to instruct on an element of an offense, is subject to harmless-error analysis under *Chapman*, *supra*, 386 U.S. at page 24. (*Washington v. Recuenco* (2006) 548 U.S. 212, 219-220; *People v. Sandoval* (2007) 41 Cal.4th 825, 838-839.) Under this standard, "if no rational jury could have found the missing element [or sentencing factor] unproven, the error is harmless beyond a reasonable doubt and the conviction [or sentence] stands. [Citations.]" (*People v. Ortiz*, *supra*, 101 Cal.App.4th at p. 416; see *People v. Sandoval*, *supra*, 41 Cal.4th at p. 839; see also *People v. Brenner* (1992) 5 Cal.App.4th 335, 339.) The Attorney General does not suggest such analysis is appropriate here, where due process concerns are raised by failure of the information to include any reference to subdivision (c) of section 136.1 and/or subdivision (b)(4)(C) of section 186.22. (Cf. *People v. Mancebo* (2002) 27 Cal.4th 735, 745-751, 753.) At least one court has held that subdivision (c)(1) of section 136.1 describes neither a sentencing factor nor an enhancement, but rather "must be recognized as describing a greater offense with its own alternative and separate sentencing scheme. [Citation.]" (*People v. Torres* (2011) 198 Cal.App.4th 1131, 1147.) That court further observed: "It is elementary that a defendant should not be punished for a crime of which he was not convicted. [Citation.]" (*Id*. at p. 1148.)

as applicable to those persons convicted of a felony offense listed in subdivision (c) of section 667.5, rather than the more generous provisions of section 4019. Defendants assert this conduct credit calculation was an unauthorized sentence because dissuading a witness is not a violent felony. The Attorney General concedes this issue and we accept the concession.

## **DISPOSITION**

As to each defendant, the judgment of conviction is affirmed. The sentence is vacated and the matter is remanded to the trial court for resentencing, including recalculation of conduct credits.

_____
DETJEN, J.

WE CONCUR:

_____
HILL, P.J.

_____
GOMES, J.